### W. B. Tolleson v. Charles Rogan, Commissioner, and B. E. Waggoner.

#### No. 1135. Decided April 18, 1903.

**1.—School Land—Lease—Sale During Term.**

The restriction upon the sale of leased school lands during the term of the lease "until otherwise provided by law," contained in the Act of May, 1897 (Gen. Laws, chap. 129, p. 186, amending art. 4218s, Rev. Stats.), was enacted for the protection of lessees, and did not prohibit a sale during the term to the lessee or his assignee. (Pp. 425-433.)

**2.—Same.**

The various statutes regulating the sale and leasing of school lands from 1883 to 1897 examined, to determine the policy and purpose of the Legislature in their enactment. (Pp. 427-432.)

**3.—Statutes—Construction by Executive—Legislative Approval.**

The effect of construction of statutes by officers required to enforce them and of legislation enacted with presumed knowledge of such construction, considered. (Pp. 432, 433.)

Original application for writ of mandamus from the Supreme Court to the Commissioner of the General Land Office.

*Ashby S. James* and *E. H. Yeiser,* for petitioner.—It is difficult to see upon what ground the Land Commissioner can justify his action in accepting applications and awarding land held under lease during the term of the lease and while it is in good standing. If the law means anything, it certainly means that he is prohibited from selling this land and any citizen is prohibited from going on it as a settler and applying for it prior to the expiration of the lease. It may, however, be contended by the Land Commissioner that under his construction the lessee himself had the right to purchase the land during the pendency of the lease. This proposition, however, is denied by the relator; but it might be conceded, and still it would not justify the Land Commissioner in permitting the lessee to subdivide his lease and transfer the subdivisions to other persons and thereby confer upon them a prefer-

ence right to purchase this land over the citizens of this State generally. This court has already held in the case of Hazlewoood v. Rogan that the preference right to purchase school land at the expiration of a lease could not be assigned and transferred by the lessee to a third person but was a right given to the lessee alone, and if he failed to exercise it he could not by the transfer of his lease before its expiration transfer that right to a third person. The reasoning in that case is undoubtedly applicable to the proposition contended for by relator in this case; it was certainly never intended by the Legislature by the Act of 1897 to confer upon a large leaseholder the exclusive right during the term of his lease to dictate the purchasers of every section of land contained in his lease. Such a construction is contrary to public policy as well as in direct violation of the act itself, since it would permit the leaseholder of every large lease in the State to speculate upon the citizens of this State and demand of them a large bonus in order to acquire a preference right to secure land as against all of the other citizens of the State who might desire to acquire some of it.

*C. K. Bell,* Attorney-General, and *T. S. Reese,* Assistant Attorney-General, for respondent Rogan.

*Ed. J. Hamner, Browning, Madden & Truelove,* and *Cowan, Burney & Lee,* for respondent Waggoner.

WILLIAMS, ASSOCIATE JUSTICE.—This is an original application to this court for a mandamus to compel the respondent, as Commissioner of the General Land Office, to accept and approve Tolleson's application to purchase section 72, certificate 488, block 25, Houston & Texas Central Railway Company survey, in Scurry County, which had been surveyed, classified and appraised for the school fund. B. E. Waggoner, a claimant of the section under a prior application accepted by the Commissioner, is a party to the proceeding. The petition originally sought to enforce a like duty with reference to other sections, and other persons claiming them were made parties, but before the hearing complainant discontinued his suit as to those sections and parties and further notice of them is unnecessary.

Section 72, along with others, was, under the Act of 1895, leased by the Commissioner to Brooks Bell for a term of five years from August 30, 1895. Tolleson made his first application to purchase January 13, 1900, which was on January 24, 1900, rejected by the Commissioner because of the existence of the lease. On the 13th day of August, 1900, Bell executed to Waggoner an assignment or transfer of all right, title and interest in section 72, which transfer was filed in the General Land Office August 27, 1900, and on the last named day Waggoner made application to purchase the section, which was awarded to him. Thereafter on August 30 and 31, 1900, respectively, Tolleson made two new applications to purchase section 72, which were afterwards rejected by

the Commissioner because of the previous sale to Waggoner. It is thus seen that Waggoner's application to purchase was made before the date at which the lease to Bell would have expired according to its terms; and relator's contention is, that by the lease the land had been taken off the market and was not subject to sale; that the award to Waggoner was therefore unauthorized, and that his own application, made after the lease had terminated, entitled him to the land. The land in controversy is included within what is known as the absolute lease district created by the Act of 1897, and relator's case is rested on the following provisions of that act:

"All lands which may be leased shall be subject to sale at any time except where otherwise provided herein. This provision in regard to the sale of leased lands shall apply to leases heretofore made, as well as those hereafter to be made. Any section or part of a section which may be leased shall not be sold, nor shall the lessee be disturbed in his possession thereof during the term of his lease, in the following cases:

"1. When the lessee has actually settled upon such section, or part of a section, and erected thereon his residence and substantial improvements for permanent settlement.

"2. When he has placed on such section or part of a section improvements of the value of two hundred dollars.

"3. When the aggregate of the land owned by a settler and leased by him does not exceed one section.

"Any lands which may be leased south and west of the line herein designated shall not be sold during the term of the lease until otherwise provided by law; provided, the sections leased by any one party are not so selected as to detach sections which are thereby left unleased."

The part especially relied on is that which says that "lands leased south and west of the line herein designated shall not be sold during the term of the lease until otherwise provided by law;" the effect sought to be given to it being that of an absolute reservation from sale depriving the Commissioner of all power to sell lands in the defined territory which had been leased, during the term named in the lease. The provision, standing alone, unaffected by its context, its history and previous practical construction, and interpreted literally, would give strong support to relator's position. A more limited operation is ascribed to it by respondent's contention, which is, that this and similar provisions in previous laws were intended merely for the benefit of lessees, to protect them in the enjoyment of their leases, and did not, when such right was waived by those for whose benefit the protection was given, affect the general power to sell conferred upon the Commissioner by other sections of the statutes. This, it is urged, especially appears from the preceding provision, "nor shall the lessee be disturbed in his possession thereof during the term of his lease in the following cases," as well as from the nature of the first, second and third specifications of conditions under which sales are prohibited. These provisions, it is contended, show the purpose of the prohibition to have been merely to se-

cure lessees, under the circumstances specified, against interference by sales of their leased lands. In support of this view it is made known to the court by the sworn answers that since the enactment of the law of 1887 the several commissioners have uniformly put this construction upon this and like provisions of the statutes regulating sales and leases of the school lands, and have uniformly sold lands under lease to lessees and to others with their consent; and that under this construction many sales have been made under each of these statutes which would be upset if that construction were now overthrown. The respondent Rogan also states that, before making such sales he adopted the practice of requiring lessees to file in his office their written transfers to persons applying to purchase. To see the full strength of this contention a review of the history of the legislation referred to is necessary.

In 1883 the Land Board was authorized to sell or lease these lands, preferring sales when they could be made. This law declared that leased lands remained "subject to sale" to persons desiring to make actual settlement, except that, where the lessee had but one watered section in the same vicinity, the law provided "such section shall not be subject to sale and settlement during the term of the lease." The Act of 1887 transferred to the Commissioner of the General Land Office the power to sell and lease, and declared that when the lands had been classified and appraised as required, they should be "subject to sale to actual settlers," etc. When the Commissioner became "satisfied that the lands were not in immediate demand for purposes of actual settlement, and that such lands can be leased without detriment to the public interest," he was authorized to make leases. The act declared that leased lands classified as grazing were not "subject to sale during the existence of such lease, and the possesssion thereof by the lessee shall not be disturbed during the term of such lease;" and that lands classified as agricultural were to be leased "subject to sale," except in cases where the lessee had placed improvements of the value of one hundred dollars on the section sought to be purchased. Certain sections of this act were amended by the Act of 1889 in which the same language was repeated. The Act of 1889 was amended by that of 1891, which authorized leases of five and ten years, according to the territory in which the lands were located, and provided that lands of which ten years leases were authorized "shall not be subject to sale during the term of the lease contract thereof, and the possession of the lessee shall not be disturbed during the term of his lease;" and that lands of which five years leases were authorized "shall be subject to sale," except that, where a lessee actually settled upon a section included in his lease and erected thereon his residence and substantial improvements for permanent settlement, "such section shall not be sold nor shall such settler be disturbed during the term of his lease." This act further provided that agricultural lands, leased for ten years, "shall be subject to sale to actual settlers," except where settlement and improvements were made by the lessee as provided. It further required an

actual settler desiring to purchase land leased for five years to first make substantial improvements of the value of one hundred dollars.

In 1895 a new act was passed regulating sales and leases of school lands. In its general structure it followed the Act of 1887 and its amendments, but contained many new and different provisions. It committed the making of sales and leases to the Commissioner, as before, made all the lands when classified and appraised "subject to sale," and authorized leases when the Commissioner was satisfied that lands were "not in immediate demand for actual settlement." Agricultural and permanently watered lands were to be leased for terms not longer than five years, and pasture or dry grazing lands for not longer than ten years. By section 18 the latter class of lands were declared "not to be subject to sale, nor shall the possession thereof by the lessee be disturbed during the term of the lease, except as herein provided." The act then makes some very complicated regulations defining conditions under which lands already leased might be sold or leased to others. Agricultural lands leased by actual settlers were declared "subject to sale and settlement" with a condition that need not be stated. We discover nothing in these lengthy and confused provisions of section 18 to materially affect the construction of the language quoted, which is the same in substance as that found in the previous laws. Section 23 of the act, however, expressly provided: "Lessees shall have the right to purchase their leased lands, subject to the limitations as to quantity provided by this act, and at the price and on the conditions herein provided, without reference to any improvements made on such lands by such lessee; and all improvements made by lessees on lands leased by them are hereby declared to be personal property, which may be removed by such lessees on the expiration of their lease contracts; and they shall have sixty days after such expiration to remove the same."

The Act of 1897, first referred to, merely amended that of 1895 by substituting certain sections with others, section 18, in which is found the provision which we first quoted, being among the number. Another statute was passed in 1901, which does not affect the case and the effect of which is not considered. Section 23 was not touched. [Note.] The general purpose and policy pervading these laws is easily seen. The Constitution having commanded the Legislature to provide for the sale of these lands, the statutes were passed in obedience to its mandate, and the favorite policy, sedulously promoted, plainly appears to have been that of selling when sales were practicable. The impracticability of early sales of much of the land, from lack of demand, being apparent, the Legislature, in 1883, in order to derive some revenue from it until sales could be made, authorized leases, but kept the lands still subject to sale with one narrow exception, by which tracts of a defined character were taken out of the general rule and made not subject to sale and secured to the use of the lessee during the term fixed by the lease. This provision was the origin of the prohibitions in the various statutes of sales of leased lands, and it would be difficult to maintain that it rose to the

dignity of a reservation of the named sections from sale, or was more than a mere protection given to lessees, or that the land board had not the power to sell such sections to lessees, or to other persons, when the rights of lessees were out of the way. The subsequent legislation indicates that the Legislature found it consistent with the general policy of selling as fast as possible to enlarge the provisions for leasing and the rights of lessees; but all of the statutes show the permanent and prevailing purpose to have been that sales should be made when practicable, while leasing was to be temporary and exceptional and resorted to only when lands were not in immediate demand for actual settlement. In order to facilitate the leasing of lands, when this condition existed, larger privileges were offered to lessees. and the Commissioner was empowered to lease lands which were deemed least likely to at once come into demand for settlement, so that they should not be subject to sale nor the lessee be disturbed during his term. The construction that the officer clothed with the power of both selling and leasing could sell to any qualified purchaser lands under lease, where a sale would in no way interfere with the rights of the lessee, would be not only consistent with, but promotive of, this general policy of the law and the constitutional duty of the Legislature to effect sales. This is an important consideration in determining whether or not such construction is consistent with the language of the statutes, which remains to be seen. The language of the statutes from 1887 to 1895, inclusive, which forbids sales of leased lands, is the same as that used in the Act of 1883 on the same subject, and it is certainly not unreasonable to hold that it was all along used in the same sense and for the same purpose. Under the laws subsequent to 1883 it has a much wider operation than it had under the statute of that year, in that much more extensive classes of land were brought within its scope; but this fact does not necessitate, even if it would authorize, the conclusion that the Legislature, with no change in language, intended to change the nature of the provision from that of a mere safeguard for the benefit of the lessee to an absolute reservation of leased lands from sale, taking from the agent of the State all power to sell even where this could be done consistently with the rights of the lessee. Besides, in each of these statutes the provision is immediately connected with other and new ones plainly intended only to secure to the lessee the benefits of the lease. Inasmuch as actual settlement and continued occupancy by purchasers were required, sales could not be indiscriminately made without interfering with the lessee's possession, and hence the Legislature could not, consistently with these requirements, leave the leased lands generally subject to sale and at the same time secure lessees in an uninterrupted use; but a power in the Commissioner to sell when the lessee waived his rights would be wholly consistent with all of the objects of the law. The general provisions of the statutes making subject to sale all lands when classified and appraised, and empowering the Commissioner to sell, would authorize sales of any and all of the lands, whether leased or not, unless this power would be

inconsistent with the provisions which made certain lands when leased not subject to sale; and whether there be such inconsistency or not depends upon the nature and extent of the restriction thus imposed. Section 23 of the Act of 1895 permitting lessees to buy or recognizing their right to buy, might tend to the implication that no one else should be permitted to do so. But if it be true, as has been held by the Commissioner, that leased lands could, under other provisions, be lawfully sold to, or with the consent of, the lessee, that section was not necessary to confer the right; and it is not unreasonable to assume that it was inserted not for the first time to enable lessees to buy, but merely to secure to lessees purchasing the other privileges mentioned in it, and not to exclude the power to make sales otherwise authorized. The Commissioner, according to the record, had for years been making numerous sales to lessees and to others with the consent of the lessees, and we must assume that the Legislature, when it came, in 1895, to revise all of the laws regulating the subject, knew of this ruling, and that it would, if the intention had been to forbid such action in the future, have expressed that intent in clear and unequivocal language. Instead, the Legislature repeated, without modification, the provisions which had been so construed and acted upon, and in doing so it is fair to presume that it acquiesced in the construction.

Having reached the conclusion that the statutes preceding the Act of 1897 were susceptible of the construction put upon them by the different commissioners, we will now inquire whether or not that act made such changes as to require a different construction. The quotation from it made at the outset contains all of the changes which, in our opinion, materially affect the case. The opening sentence declares all leased lands "subject to sale at any time, except where otherwise provided herein." The provision is then inserted that leased sections "shall not be sold, nor shall the lessee be disturbed in his possession during the term of his lease, in the following cases." Then are specified three conditions of fact the existence of which, in leased land anywhere situate, shall exempt it from sale. Then follows the provision declaring that lands leased in the defined district "shall not be sold during the term of the lease until otherwise provided by law." The only difference between these provisions giving exemption from sale and those of previous laws are in the arrangement of the different provisions, the change in the language from, "shall not be subject to sale," to "shall not be sold," and the omission from the last provision of the clause, "nor shall the lessee be disturbed," etc. All of the provisions giving exemption are expressly made exceptions to the opening provision, declaring lands in general subject to sale, and are thus associated together. The last exception is the introduction to a long provision defining the absolute lease district, and this explains the change in arrangement. The language, "shall not be sold," with reference to particular land, is used as the exact reverse of the words, "shall be subject to sale," with reference to lands generally, and shows that the Legislature meant the same

as if it had again used the words, "shall not be subject to sale." Plainly this change is of no importance to indicate a change in the nature of the immunity from sale intended to be given. Besides, in the Act of 1891, we find the same language "shall not be sold" clearly used only to give a protection to the lessee and not to make a reservation to the State. A repetition, in the last provision, of the ·clause, "nor shall the lessee be disturbed," etc., was wholly· unnecessary. It had been already used to apply "in the following cases"—the exceptions made to the general rule— of which the exemption from sale of the lands leased in the district was one. Some stress is laid upon the closing phrase "until otherwise provided by law" as indicating a purpose to reserve the land specified from sale until such other provision should be made. But the provision is that such land shall not be sold *"during the term of the lease* until otherwise provided." It was evidently designed to reserve the right thereafter to provide that leased lands might be sold without regard to the rights of the lessees. The appropriate language in which to express the idea contended for would be "shall not be sold during the term of the lease *nor* until otherwise provided by law." This would withhold lands once leased from the market even after the lease had expired, until further provision was made for selling. Plainly this was never intended. The literal construction insisted upon of the one sentence of the Act of 1897 would prevent sales to lessees during the term of the lease, not-withstanding section 23 of the Act of 1895, expressly recognizing the right of lessees to buy, was not amended or repealed by the last law, which is strongly persuasive that the provision is not to be taken as a reservation of the land, beyond all power to sell it, merely because it was held under lease. The only difficulty we see in restricting the provision in question, as has been done by the commissioners, is that the language is broader than was necessary for that purpose. The same difficulty arises under all of the statutes. The ·meaning put upon them by construction would have been fully expressed had they simply pro-vided that leased lands should not be sold during the term of the lease without the consent of the lessee. But the statutes indicate that the Legislature had .in mind sales which would disturb the lessee in his possession, and the prevention of this is the only purpose which the statutes themselves disclose. This purpose there is no doubt about, and it could be fully carried out and, at the same time, the general policy of selling whenever opportunity offered, could be promoted by the course pursued by the officers of the government. Whether or not any other purpose was in view can only be conjectured. If there were any the laws do not express them. It was suggested that it was a policy of the law to have lands to be sold so put on the market that all persons might have equal opportunity to purchase, and that this would be defeated by allowing particular persons, who could obtain the consent of lessees, to purchase when others could not. No competitive bidding was required. The lands, when on the market, were sold to the first applicant at an appraised value. Leases could be terminated and the land again opened

to purchase by anyone who knew the fact, and the Commissioner was required to sell to the first applicant who complied with the law, without any notice to the public. If there was any policy of the kind contended for there is no expression of it. It was also urged that the construction adopted by the Commissioner enabled lessees to parcel out among those whom they favored and to speculate upon their leased lands. Could we know that the Legislature foresaw such results, we still could not say that a prevention of them was regarded as a sufficient reason for a surrender of the right to sell lands during the terms of leases when sales could be made, for the price demanded, to persons who possessed all the prescribed qualifications, complied with all the requirements of the law, and thus aided in the disposition of the lands. Collusion in all purchases was provided against. It is certain, that, during the many years when its agents were so construing the law and making extensive sales under it, the Legislature has expressed no condemnation of their course, nor materially changed the provisions of law under which they so acted, from which we should conclude both that such course was in keeping with the legislative intent and that it had resulted in no evil which the Legislature thought proper to remedy.

We have endeavored merely to point out some of the reasons which may be urged in support of the long continued construction of these laws made by those whose duty it was, in the first instance, to construe and execute them, in order to show that such action was not so clearly wrong as to justify the courts in disregarding it. The great weight which, from necessity, courts must often give to the contemporaneous construction put upon laws by other departments and officers to whom is committed their practical administration, is so well understood that it need not be dwelt upon. Sound public policy requires the solving of all mere doubts in favor of constructions so made and uniformly acted upon. Fitter occasion for the recognition of this could not well be imagined than controversies arising upon the construction of these land laws, extensive in their provisions and in the subjects upon which they operate, bristling with questions, and requiring at every step decisions which the Commissioner must make at the peril of purchasers and others dealing with him. Upon many of his rulings are based thousands of sales, on which rest the titles of purchasers which may be destroyed by decisions in the courts reversing such rulings. While, as this court has frequently held, actions of such officers in plain opposition to law can not be upheld, it is equally true they are entitled to great weight in determining the true construction of doubtful and indefinite regulations made for their guidance. The Legislature, in charging him with the duty of attending to this business, gave to the Commissioner "all the power and authority necessary to carry into effect the provisions of this act," and invested him with "full charge and discretion of all matters pertaining to the sale and lease of said lands, etc., with such exceptions and under such restrictions as may be imposed by the provisions of this act or by the Constitution." It made it his duty to "adopt

such regulations, not inconsistent with the Constitution or this act, as may be deemed necessary for carrying into effect the provisions of this act," and "to call upon the Attorney-General for advice whenever there is doubt as to the meaning of this act or any provision thereof." While this was followed by such minute regulations attempting to specify, in many things, exactly what he should do and when and how he should do it, as, in many instances, to leave little room for the exercise of discretion or the making of regulations, it is nevertheless true that there must be many conjunctures in which the law is silent or is indefinite and doubtful, and in which regulations and decisions by him not inconsistent with the law are but the exercise of power expressly conferred.

In the matter under consideration, admitting that there is doubt as to what action these officers should have taken in order to "carry into effect the provisions" of these statutes, the very existence of the doubt makes it proper that their determination, so long acted upon and involving so much, should not be reversed at this late day. The constant action of the Legislature in legislating upon the subject, without change in the regulations upon which the commissioners were acting, or any disapproval of their course, makes their action well nigh conclusive.

The first application of relator was made when the lease was in full force without the consent of the lessee, and hence the Commissioner could not sell to him. Waggoner's application was accompanied by a transfer from the lessee in compliance with the regulation of the Commissioner and entitled him to an award of the land, and relator's subsequent applications were therefore properly refused. We give no other effect to the transfer than to hold that, under the law as construed, it removed the obstacle to a sale interposed by the lease, and gave room for the exercise of the power of the Commissioner to sell and of the applicant to buy given by the law. We do not hold that the right to purchase was acquired from the lessee. It follows that applicant is not entitled to the writ.

*Writ refused.*

Note.—In the preparation of the foregoing opinion the sentence, "Another statute was passed in 1901, which does not affect the case and the effect of which is not considered," was, by clerical error, made to precede the statement that "section 23 (of the Act of 1895) was not touched," when it should have followed that statement, so as to express the meaning that section 23 was not touched by the Act of 1897. It was not intended to express any opinion as to the effect of the 1901 act upon section 23.

F. A. WILLIAMS,
Associate Justice.

May 12, 1903.