## R. B. MOORMAN v. H. B. TERRELL, COMPTROLLER.

### No. 2962. Decided April 24, 1918.

**1.—Statutory Construction.**

A statute speaks as of the time at which it takes effect (Fischer v. Simon, 95 Texas, 240). Collectors whose salaries are fixed by what is known as the "Fee Bill," in the general law, regulating elections (1st Called Session, 29th Leg., p. 557, sec. 144), refer to the Fee Bill as it existed in 1905, when said section 144 became a law, that is the Act of June 16, 1897, as amended by the Act of June 19, 1897 (General Laws, Special Session, 25th Leg., pp. 5 and 42). (P. 175.)

**2.—Same.**

One section of a statute should not receive a construction, however plainly required by its language standing alone, which would defeat the obvious legislative intent to be gathered from all parts of the enactment of which it is a part. (Pp. 176, 177.)

**3.—Same—Fee Bill—County Population.**

Section 17, of the Fee Bill, enacted June 16 and 19, 1897 (Laws, Special Session, 25th Leg., ch. 5 and 15, pp. 5 and 42), standing by itself, would determine the counties of less than 15,000 population to which such fee bill did not apply by the votes cast at the next preceding presidential election on the basis of five inhabitants for each vote cast; but comparison with sections 10, 11, and 16, and the evident purpose of the Act show the intent to adopt such method of determination only until the next Federal census should furnish

a more reliable method, and section 17 should be construed as applying the method therein named only until such census was taken.    (P. 177.)

### 4.—Same—Tax Collector—Fees of Office.

Bosque County, having a population exceeding 15,000 by the United States Census both of 1900 and 1910, was one in which the fees of its officers were fixed by the Fee Bill, within the meaning of section 144 of the General Election Law (1st Called Session, 29th Leg., p. 557), and as such its collector is allowed 10, not 15 cents, for each poll tax receipt or certificate of exemption issued by him during the fiscal year 1915-16.    And this, though tested by the rule laid down in section 17 of such Fee Bill (five inhabitants for each vote at the last presidential election), its population would be less than 15,000.    (Pp. 174-178.)

Original application by Moorman to the Supreme Court for writ of mandamus against Terrell as State Comptroller, to require respondent to allow him a credit claimed in his accounts as county tax collector.

*Lightfoot, Brady & Robertson,* for petitioner, cited:   Ellis County v. Thompson, 95 Texas, 31; Stephens v. Campbell, 63 S. W., 161; Marston v. Yaites, 66 S. W., 867; Fischer v. Simon, 95 Texas, 234, 66 S. W., 882; Swain v. Mitchell, 27 Texas Civ. App., 62, 66 S. W., 61; Bell v. Williams, 23 Texas Civ. App., 407, 56 S. W., 774; State v. Bossa, 69 Conn., 335, 37 Atl., 977; McKean v. Archer, 52 Fed., 791; Jonesboro v. Railway Co., 110 U. S., 192, 28 L. Ed., 116.

*John C. Wall,* Assistant Attorney General, for respondent, cited: Sparks v. Kaufman County, 194 S. W., 607; Culver v. People, 161 Ill., 89, 43 N. E., 814; Graves v. City of Seattle, 35 Pac., 1079.

MR. JUSTICE GREENWOOD delivered the opinion of the court.

The following facts are alleged by the relator and are admitted by the respondent:

Relator qualified as tax collector of Bosque County, Texas, December 3, 1912.    The total vote cast in said county at the presidential election of 1908 was 1713, and at that of 1912 was 1472.    By the United States census of 1900 the population of Bosque County was 17,390, by the census of 1910 it was 19,013.    During the fiscal year 1915-16, relator issued 3196 poll tax receipts and certificates of exemption, and retained $479.40, as fees therefor, being at the rate of 15 cents each, six-sevenths of which amount, or $410.91, he charged against the State.    Respondent, instead of giving him credit for the receipts and certificates at the rate of 15 cents each, gave him credit therefor at the rate of only 10 cents each, amounting to $273.95.

Relator claims he should have received full credit of $410.91, and seeks a writ of mandamus directing and requiring respondent to now credit his account with the difference of $136.96, so as to balance relator's account for said year.

Relator's right to the writ depends on the construction to be given to article 2986, Revised Statutes, which is section 144 of the general

law regulating elections, passed by the First Special Session of the
Legislature in 1905, and which reads as follows:

"The collector of taxes shall be paid fifteen cents for each poll tax
receipt and certificate of exemption issued by him, to be paid pro rata
by the State and county in proportion to the amount of poll tax re-
ceived by each; and this shall include his compensation for administer-
ing oaths, furnishing certified lists of qualified voters in election pre-
cincts for use in all general elections and primary conventions, when
desired, and for all duties required of him under this title; provided,
that collectors, whose salaries are fixed by what is known as the fee
bill, shall receive ten cents for each poll tax receipt and certificate of
exemption issued by him; and such fees shall be ex-officio and not ac-
countable under said fee bill." General Laws, 1st Called Session, 29th
Leg., p. 557.

The real controversy is as to whether the relator comes within the
meaning of the words: "collectors whose salaries are fixed by what is
known as the fee bill."

In order to determine the controversy, we must look to the statutes
"known as the fee bill," as the same existed in 1905, when section 144
became a law, "since the rule is that a statute speaks as of the time at
which it takes effect." Fischer v. Simon, 95 Texas, 240, 66 S. W.,
447, 882.

The "fee bill" referred to in section 144 is the Act of the Special
Session of the Twenty-fifth Legislature, approved June 16, 1897, as
amended by the Act approved June 19, 1897, fixing maximum amounts
of fees to be retained by certain officers. General Laws, Special Ses-
sion, 25th Leg., pp. 5 and 42.

As applied to the collectors of taxes, section 10, of the original Act
and of the amended Act, fixed "an amount not exceeding $2000 per
annum" as the maximum amount of fees that might be retained by
such officer, and "in addition thereto one-fourth of the excess of the
fees" collected by him, provided that "up to 1902 in counties in which
there were cast at the last presidential election as many as 5000 votes,
and thereafter in any counties shown by the national census of 1900
to contain as many as 25,000 inhabitants," the collector should be al-
lowed an amount not exceeding $2250 per annum, and, in addition
thereto, one-fourth of the excess of fees collected by said officer; and
provided further, that "in counties containing a city of over 25,000 in-
habitants, or in which there were cast at the last presidential election
as many as 7500 votes or by the census of 1900 shall contain as many
as 37,500 inhabitants," the collector should be allowed an amount not
exceeding $2500 per annum, and, in addition thereto, one-fourth of the
excess of fees collected by said officer. Section 10 also declared that
the last United States census should govern as to the population of cities.

Section 11 of the Act required each officer mentioned in section 10,
as well as the sheriff, at the end of each fiscal year, to make to the
District Court "a sworn statement, showing the amount of fees col-

lected by him" during such year, besides other matters; and required that all fees, in excess of the maximum amounts allowed to be retained, be paid by the officers mentioned to the county treasurer.

Section 16 of the Act made it the duty of the officials named in section 10, and the sheriff, to keep a correct statement of the sums coming into their hands as fees and commissions, in a book to be provided for the purpose,·and made it the duty of the grand jury to examine and report on these accounts at one session each year of the District Court.

Section 17 of the Act reads: "The officers named in section 10 of this Act, in those counties having a population of 15,000 or less, shall not be required to make a report of fees as provided in section 11 of this Act, or to keep a statement provided for in section 16 of this Act; the population of the county to be determined by the vote cast at the next preceding presidential election, on the basis of five inhabitants for each vote cast at such election; provided, that all district attorneys shall be required to make the reports and keep the statements required in this Act."

We think it is obvious that the collectors who were to receive only ten cents for each poll tax receipt and certificate of exemption issued by them were those who were·subject to all the requirements of sections 11 and 16.

If we consider section 17·alone, the conclusion could not be escaped that the tax collector of Bosque County, during the fiscal year of 1915-1916, would be without the requirements of sections 11 and 16, which are referred to in section 17. For, he was an "officer named in section 10," in a county, having a population of less than 15,000, when determined "by the vote cast at the next preceding presidential election."

If this construction of the Act were correct, then officers entitled to the highest maximum of fees under section 10, towit: $2500 and one-fourth of the excess, would not, in many instances, be compelled to make the report, required by section 11, nor to keep the statement provided for in section 16. For, a county with a population of 37,500 inhabitants ·or·over, under the census of 1900 and of 1910, which voted less than ·3000 votes in the presidential elections of 1896 and afterwards, would ·have less than 15,000 population, if determined by the method stated ·in section 17. Yet, it can not be successfully denied that a main pur-·pose of the Legislature was to reduce the fees in the largest and larger ·counties of the State, and the reports and accounts required to be made ·and kept by sections 11 and 16 were essential means of effecting the ·reduction.

We can not adopt a construction of section 17, no matter how plainly ·required by its language, standing alone, which would defeat the intent ·of the Legislature in the ·enactment of this Act.

In Ellis County v.·Thompson, 95. Texas, 32, 64. S. W., 927, 66 S. W., ·48, the defendant in error sought to have certain language of section 10, of this same Act, enforced according to its literal meaning. In

declining to so enforce the particular language relied on in section 10, this court in the opinion by Justice Brown, said:

"We can not, however, consent to be confined to one section of the Act in disregard of all other parts even if the language were unambiguous. The paramount rule of construction is to find out the legislative intent, which is the law and must prevail. Suth. Stat. Const., sec. 218; Runnels v. Belden, 51 Texas, 48; Russell v. Farquhar, 55 Texas, 359. In Runnels v. Belden, Chief Justice Moore said: "It is unquestionably a fundamental canon of construction that such interpretation shall be given to Acts of the Legislature as will effectuate the intent and purpose of the law-makers in their enactments, when the intent of the law is plain and obvious, rather than to follow its literal import or mere grammatical construction." In the case of Russell v. Farquhar the same learned judge used the following language: "If courts were in all cases to be controlled in their construction of statutes by the mere literal meaning of the words in which they are couched, it might well be admitted that appellants' objection to the evidence was well taken. But such is not the case. To be thus controlled, as has often been held, would be for the courts in a blind effort to refrain from an interference with legislative authority by their failure to apply well established rules of construction to, in fact, abrogate their own power and usurp that of the Legislature, and cause the law to be held directly the contrary of that which the Legislature had in fact intended to enact. While it is for the Legislature to make the law, it is the duty of the courts to "try out the right intendment" of statutes upon which they are called to pass, and by their proper construction to ascertain and enforce them according to their true intent. For it is this intent which constitutes and is in fact the law, and not the mere verbiage used by inadvertence or otherwise by the Legislature to express its intent, and to follow which would pervert that intent."

When the maximum fee Act became effective, a census, which is recognized by all men as the surest means of determining population, had not been taken for seven years, and during the seven years the population of many counties in Texas had rapidly increased. A presidential election, however, had been held the year before. The next regular census would be taken in 1900. It seems plain to us that the Legislature decided that it would be best to merely estimate the population of the counties from the presidential vote, until the census would be taken and published, but intended, after the results of the census would be available, to ascertain the population from the census.

If this was the legislative intent, it follows that section 17 should be construed to declare that the officers named in section 10 in those counties having a population of 15,000 or less should not be required to make the report of fees provided for in section 11, or to keep a statement as provided for in section 16, the population of the county to be determined, up to 1902, by the vote cast at the next preceding presi-

Vol. 109-12.

dential election, on the basis of five inhabitants for each vote cast at such election, and to be thereafter determined by the national census.

To give section 17 this meaning is to bring all the provisions of the Act into harmony.  Spence v. Fenchler, 107 Texas, 457, 180 S. W., 597.

Our conclusion is in accord with that of the Court of Civil Appeals, in Sparks v. Kaufman County, 194 S. W., 607, as follows: "It is not conceivable that the Legislature intended, in exempting the officers in counties containing less than 15,000 inhabitants from making the reports required of all officers named in section 10, to adopt a basis of computing population, the effect of which would be to pervert and render nugatory the carefully arranged and considered provisions of the law in reference to the maximum of compensation. We conclude such was not their intention, and that the method of computing the population provided in section 17 must give way to those provisions of section 10 on the same subject."

Again, sound public policy requires the solving of mere doubts in favor of the construction put upon laws by the departments and officers charged with their administration, and our decision is in conformity with the rulings of the departments during the administrations of Attorneys General Davidson and Looney, though in conflict with a ruling during an intermediate administration.  Tolleson v. Rogan, 96 Texas, 432, 73 S. W., 520; Houston & T. C. Ry. Co. v. State, 95 Texas, 507, 68 S. W., 777.

The mandamus is refused.