**RAILROAD COMMISSION OF TEXAS et al.
v. TEXAS & NEW ORLEANS R. CO.
et al.**

No. 7625.

Court of Civil Appeals of Texas. Austin.
Oct. 14, 1931.

Rehearing Denied Nov. 4, 1931.

Jas. V. Allred, Atty. Gen., Elbert Hooper, Asst. Atty. Gen., S. L. Staples, of Austin, and Luther Nickels, of Dallas, for appellants.

Claude Pollard, of Austin, Adair Dyer, of Dallas, Thompson & Barwise and N. H. Lassiter, all of Fort Worth, Terry, Cavin & Mills, of Galveston, and Andrews, Streetman, Logue & Mobley and Baker, Botts, Andrews & Wharton, all of Houston, for appellees.

### BLAIR, J.

Appellees, certain railroad companies incorporated as steam railroads under the Acts of 1876, filed this suit, and on the hearing to the court without a jury obtained an order perpetually restraining appellants, the Railroad Commission of Texas, the Attorney General, and several district attorneys of Texas, from requiring them to maintain on their gasoline, electric, and gasoline-electric motor cars or trains, carrying passengers over their steam railroads, any particular number of men, or men of any particular name or designation, and particularly a fireman, under the terms of that portion of article 6380, R. S. 1925, which reads as follows:

"No railroad company or receiver of any railroad company doing business in this State shall run over its road, or part of its road, outside of the yard limits:

"1. Any passenger train with less than a full passenger crew consisting of four persons: one engineer, one fireman, one conductor and one brakeman. * * *

"Any such company or receiver which shall violate any provision of this article shall be liable to this State for a penalty of not less than one hundred nor more than one thousand dollars for each offense."

The first Full Crew Law was enacted in 1907 (chapter 41) identical in language with article 6380, supra. This act was declared unconstitutional for defect in its caption. Missouri, K. & T. Ry. Co. v. State, 102 Tex. 153, 113 S. W. 916, 917. The statute was re-enacted in 1909 (chapter 100) without change in language, but correcting the caption defect. On June 16, 1908, after passage of the 1907 act and prior to the passage of the 1909 act, in reply to a communication from Hon. Allison Mayfield, chairman of the Railroad Commission of Texas, the Attorney General's department construed the first (act 1907) Full Crew Law, and held that it "does not apply to the operation of gasoline motor cars."

In 1911 the Legislature, in recodifying the laws, re-enacted the Full Crew Law without change in language. On April 2, 1913, in reply to an inquiry of the Hon. J. A. Starling, commissioner of labor of Texas, the Attorney General's department, after quoting the language set out in article 6380, supra, held as follows: "We think therefore that when the legislature undertook to pass Senate Bill No. 240, it had in mind steam railroads and the regulation thereof, and that in the construction of the statute we should consider the term railroad company as used therein to mean a steam railroad company. This we believe is made conclusive by the use of the terms engineer and fireman in Sections 1, 2 and 3, and especially as used in Section 3 defining a full crew for a light engine. For the same reason, we believe that under a proper construction of the statute the legislative intent was to require a full crew on the trains and engines operated by steam power, and that the statute did not apply to a motor car operated by electric or gasoline power."

On March 14, 1919, in reply to the inquiry of Hon. Allison Mayfield, chairman of the Railroad Commission, the Attorney General's department, after quoting the statute, held as follows:

"'In the operation of a gasoline motor car carrying passengers on a steam railroad, will you please advise if we are required to have more than a conductor and motorman in charge? If so, how many, and does it make any difference whether one car is operated single, or two cars coupled, as to the number of men in charge?'

"When this Act was first enacted by the legislature in 1909, and prior thereto, gasoline motor cars for carrying passengers were not

then being operated; and in our opinion this statute ought to be construed as the conditions existed at the time of its passage and we believe that it refers to trains operated by steam engines on railroads and does not apply to gasoline motor cars carrying passengers on a steam railroad, since such gasoline cars were not in operation at the time said law was first enacted."

In 1925 the Legislature in recodifying the statutes again re-enacted the Full Crew Law identical in language with all former acts and codifications. In 1925 the Legislature, in enacting chapter 154, Acts 39th Legislature, dealing with daily operations of passenger trains, declared in the emergency clause that the operation of a "gasoline or electric motor car * * * shall be deemed a train within the meaning of this Article." Each Attorney General, district attorney, labor commissioner, and Railroad Commission of Texas either construed or acquiesced in the construction of the Full Crew Law from the date of the first act in 1907, as having no relation to gasoline, electric, or gasoline-electric motor cars or trains carrying passengers on steam railroads, until November 26, 1929, when, upon inquiry of Hon. Clarence E. Gilmore, chairman of the Railroad Commission, the Attorney General's department construed the Full Crew Law for the fourth time, and held for the first time, in part, as follows:

"1. A motor car which runs on a railroad track or regular schedule and transports United States mail, baggage, and express and passengers, is a train.

"2. The Full Crew Law applies to all passenger trains, regardless of the form of energy employed to propel them."

It was further held in that opinion, with respect to requiring a fireman on motor cars or trains carrying passengers, as follows: "It is my opinion that the Legislature intended to protect the traveling public and the train crew by placing every safe-guard around them that a full crew could afford. That a fireman does not have the same duties to perform on a motor driven locomotive that would be necessary on a steam propelled engine, is entirely probable and true. The same method of fueling the locomotive is not employed. The necessity, however, for performance of the same duties with reference to the safety of the traveling public exists. It is the duty of the fireman on all trains to keep a lookout for danger on the track, to keep and compare the correct time with the engineer, to familiarize himself with the orders governing the movement of trains, and keep check on the engineer as to the proper observance of said orders, to take charge of the engine in event of death or disability of the engineer, to blow the whistle, ring the bell and notify the engineer upon appearance of danger, to notify the conductor when the engineer fails or re-

fuses to observe orders, and numerous other duties, all designed, in part at least, to protect the traveling public."

On December 10, 1929, the Railroad Commission, acting upon the above opinion, ordered appellee railroad companies, incorporated as steam railroads, to comply with the terms of article 6380, supra, with respect to maintaining a full crew of four persons on their gasoline, electric, and gasoline-electric motor cars or trains carrying passengers, under threat of enforcement of the penalties prescribed in the act. Whereupon appellees filed this suit and obtained the restraining order above mentioned; hence this appeal.

The question presented is whether the trial court rightly construed article 6380, supra, as having no application to and as not requiring railroad companies incorporated as steam railroads to maintain on their gasoline, electric, and gasoline-electric motor cars or trains, carrying passengers over their steam railroads, any particular number of men, or men of any particular name or designation, and particularly a fireman as that term was used in the act. We have reached the conclusion that the trial court correctly construed or interpreted the statute.

In construing a statute, the one and paramount rule is to ascertain the intention of the Legislature, which must govern in every instance. Board of Land Commissioners v. Weede, Dallam, Dig. 362; Cannon's Adm'r v. Vaughan, 12 Tex. 402; Cain v. State, 20 Tex. 362; Runnels v. Belden, 51 Tex. 50; Mills County v. Lampasas County, 90 Tex. 606, 40 S. W. 403; Moorman v. Terrell, Comptroller, 109 Tex. 173, 202 S. W. 727. The intention of the Legislature must be gathered from the language of the statute construed as a whole, giving the words used their common and ordinarily accepted meaning; and, if the words employed are free from ambiguity and doubt, and express plainly, clearly, and distinctly the intent, according to the natural import of the language used, then no occasion arises to look elsewhere. State v. Delesdenier, 7 Tex. 106; Rosenberg v. Shaper, 51 Tex. 140; Hanrick v. Hanrick, 54 Tex. 110; Boon v. Chamberlain, 82 Tex. 482, 18 S. W. 656; Murray v. State, 21 Tex. App. 631, 2 S. W. 757, 57 Am. Rep. 623; Texas & P. Ry. Co. v. Railroad Commission of Texas, 105 Tex. 386, 150 S. W. 878; article 10, R. S. 1925. It may also be here noted that the statute under construction is not only remedial in its nature, but penal as well, and must be construed with at least a reasonable degree of strictness with respect to including anything beyond the immediate scope and object of the statute, even though within the spirit, and nothing can be added to the act by inference or interdment. State v. Duke, 104 Tex. 355, 137 S. W. 654, 138 S. W. 385; State v. International & G. N. Ry. Co., 107 Tex. 349, 179 S. W. 867; State

v. Chicago & N. W. Ry. Co. (Wis.) 237 N. W. 132; 25 R. C. L. 1081, § 301.

■ Both parties insist that the language of the statute is plain, unambiguous and free from doubt with respect to the character of passenger train on which a full crew of four persons must be employed. Appellants insist that the term "any passenger train" is used generically in the statute, and is broad enough to require a full crew of four persons on all passenger trains whether operated in the past by steam, or in the present or future by gasoline or electricity, and that such was the manifest intention of the Legislature. Appellees insist that it is manifest from the language of the statute that it has no application to the character of gasoline, electric, and gasoline-electric motor cars or trains now used in carrying passengers over their steam railroads, because the act not only provided for a full crew of four men, but for a particular kind and character of full crew, to wit, one engineer, one fireman, one conductor, and one brakeman, and at the time the act was passed the term "fireman" had and has ever since had a well-recognized meaning, both in common usage and in railroad circles, as one employed primarily to tend fires on a steam locomotive, so that the statute thus furnishes the key to its own proper construction.

Manifestly the effect of the general language, "any passenger train with less than a full crew consisting of four persons," is limited by the language immediately following it, specifically naming and defining the kind and character of the four persons to be employed, to wit, one engineer, one fireman, one conductor, and one brakeman. The facts and common knowledge show that these four particularly named persons had specific duties to perform on steam-propelled passenger trains when the act was passed, thus indicating the kind or character of passenger train on which the Legislature intended a full crew of these four particular persons should be maintained. Clearly it is not, as contended by appellants, manifest from the language of the statute, standing alone, that the Legislature by unmistakable implication intended to extend the law beyond the immediate scope and object of the statute as of the time of its enactment, so as to require steam railroad companies to now maintain, without regard to name or the difference in duties imposed, a full crew of four persons on their modern gasoline or electric motor cars carrying passengers over such steam railroads. At least such construction is very doubtful, and, when certain well-settled rules and aids of statutory construction are resorted to, it becomes apparent that the Legislature had no such intention.

■ The first of these rules "is that statutes are to be construed as they were in-

tended to be understood when enacted," taking into consideration existing facts to which the law was intended to apply, and giving to the words used the sense in which they were understood at the time when the statute was enacted. 25 R. C. L. 959, § 215.

■■ The facts are undisputed that, prior to and at the time of the passage of the first full crew laws in 1907 and 1909, gasoline motor cars were practically unknown as a means of transporting passengers over steam railroads in this state. The steam locomotive with passenger coaches was the exclusive method used. Both the facts and common knowledge show that the gasoline, electric, and gasoline-electric motor car or train now used in carrying passengers over steam railroads differ very materially from the steam-drawn train existent at the time the statute in question was enacted. Both the facts and common knowledge show a steam locomotive to be a machine which derives its energy or power from steam produced by coal or oil fire applied to a boiler containing a sufficient quantity of water. The locomotive is composed of a chassis, a boiler, and fire box, and other necessary appurtenances. The operation of such locomotive required the constant attention of what were and are commonly and in railroad terminology known as an engineer and a fireman. The duty of the engineer was and is to operate the locomotive by mechanical levers and brakes, and to sit on the right-hand side of the cab near the rear end of the boiler, and keep a lookout to ascertain if the track is clear for passage of the locomotive; his view to the left being necessarily obstructed by the protruding boiler. Primarily, the duty of the fireman was and is to tend fires to make the necessary steam power, and incidental to this duty to sit on the left-hand side of the cab, opposite the engineer, and keep an outlook for clear passage of the locomotive, to aid the engineer in interpreting orders, and to act as flagman should it be necessary to do so. On the other hand, the operation of gasoline, electric, and gasoline-electric motor cars, either on the single unit car or the motor car pulling additional coaches or trailers, is practically automatic. The motive power of such cars is either gas or distilled fuel. The gasoline or gasoline-electric motor car is propelled by a motor, the electric unit being used for operating the motor and generating power, and the starting and stopping apparatus is very much the same as was employed on the ordinary electric interurban in existence at the time the statute in question was enacted. The duties of the engineer on a locomotive with respect to starting and stopping by mechanical apparatus is similar, although the mechanical structure of the steam locomotive and gasoline or electric motor is different and requires different knowledge and training

for their safe operation. The engineer, or what is universally known as a motorman on the motor car, sits on the right-hand side in front of the generating motor unit, and has practically an unobstructed view on both sides and to the front, and his duties do not interfere with his keeping a lookout and generally discharging all necessary functions required of both the engineer and fireman on a steam locomotive, for the safe operation of the motor car or train. The primary duties of the fireman of tending fires are dispensed with on the motor car by mechanical devises; there being no boiler of water or fire to keep. All these duties and those of lubrication are done by mechanical devices on the motor car. One witness testified that he thought a man to take the place of the fireman with respect to performing the duties of keeping a lookout and otherwise aiding the engineer on a locomotive was as necessary on a motor car. Several witnesses, as well qualified, testified, however, that such a man or person would not help, but rather interfere, by talking with the motorman, thereby attracting his attention from the safe operation of the car. The evidence shows that on the single unit motor car a motorman and conductor, and in some instances a baggageman, are the only employees. On the motor cars drawing additional coaches, a motorman, a conductor, a baggage man, and a brakeman are employed. Witnesses testified that these were sufficient.

It is obvious that the statute had two purposes in view, viz.: To employ at particular positions or places on steam-propelled passenger trains a sufficient number of men to properly operate them; and, as a safety measure, to protect the person, property, and lives of the employees, the passengers, and the public. It is also obvious that these were the objects and remedy in view when the statute was passed, and that the act was only intended to apply to steam-operated passenger trains, because there were no other kind of passenger trains then in existence; and the kind and character of employees specifically named in the act were those employed on steam-operated passenger trains at the time; and there is nothing to indicate that the Legislature knew or had in mind any other power for operation of passenger trains than steam engine motive power. From these facts and circumstances attending the enactment of the statute we must assume that the Legislature was dealing with and acting upon existing facts within its knowledge, and not things that might possibly arise in the future. This conclusion by analogy finds support in the case of In Funk, Adm'r, v. St. Paul City R. Co., 61 Minn. 438, 63 N. W. 1099, 1100, 29 L. R. A. 208, 52 Am. St. Rep. 608, where it was held that for taxation purposes the term "railroads" should not be interpreted to include street railways not existent at the time of the passage of the Railroad Taxing Act, the court holding as follows:

"It is claimed by the appellant's counsel, and not denied by the counsel for the respondent, and such we believe to be fact, that on February 24, 1887, when the general law of that year was passed, there were no cable or electric street railways in existence in this state. If so, what was the legislative intent in using the word 'railroad' in the law of 1887, to be deduced from the whole and every part of the statute taken together, upon the subject of railroads?

" 'When the words of a statute are not explicit, the intention is to be collected from the context, from the occasion and necessity of the law, from the mischief felt, and the object and remedy in view.' * * * What was the mischief felt which resulted in the passage of this law? Was it a danger known, or one unknown? Was it a danger then felt and realized, or one that might possibly arise in the future? We must assume that it was dealing with, and acting upon, existing facts within its knowledge."

In a case involving similar facts, the above case was cited by the Supreme Judicial Court of Maine, in State v. Boston & M. R. Co., 123 Me. 48, 121 A. 541, 545, and in which the following from 25 R. C. L. 959, was quoted with approval: "The true rule is that statutes are to be construed as they were understood when they were passed. * * * If the language used is broad enough to include unknown things which might spring into existence in the future, they would be deemed to come within, and be subject to, the evident meaning of the terms used, but it does not follow, when a newly discovered thing is called by a familiar word, which comes nearest expressing the new idea, that the thing so styled is really the thing formerly meant by the familiar word. Hence it has been held that a statute passed at a time when there were no cable or electric street railways in existence in the state, and providing that every railroad corporation owning and operating a railroad in the state should be liable for damages sustained by an agent or servant by reason of the negligence of any other servant or agent, but not broad enough in words to include unknown things, is not applicable to a street railway corporation, although its line is operated by cable."

This general rule of construction is especially applicable here where the facts show that the gasoline or electric motor now in use as the motive power for passenger trains or steam railroads sprang into existence after the passage of the act, and where the Legislature could have only known of such newly invented motor power by prophetic vision, a power not often attributed to it.

But appellants insist in this connection that by enacting as early as 1876 that portion of what is now article 6341, R. S. 1925, giving steam railroads the right "to receive and convey persons and property on its railway by the power and force of steam, or by any mechanical power," and by enacting in 1909, at the same session the Full Crew Law was enacted, the Ash Pan Law (article 6381, R. S. 1925), and providing that same "shall not apply to any locomotive upon which an ash pan is not necessary by reason of the use of oil, electricity or other such agency," the Legislature anticipated that steam railroads might in the future operate nonsteam trains or motor cars, and that, although the Legislature had no actual thought of motor cars, such lack of knowledge of and the nonexistence of gasoline motor cars at the time would not exclude them from the range of the Full Crew Law under the rule that "a general law may, and frequently does, originate in some particular case or class of cases which is in the mind of the legislature at the time, but so long as it is expressed in general language the courts cannot, in absence of express restrictions, limit its application to those cases, but must apply to all cases that come within its terms and its general purpose and policy." 25 R. C. L. 778.

The general rule quoted is well settled, but it has no application here:

First, because, as above pointed out, the general language "any passenger train" is so limited by the language immediately following it, specifically naming and defining the character of persons employed, as to indicate the legislative intent to restrict the operation of the law to those particularly named and to the operation of steam locomotive passenger trains upon which the character of persons named were employed at the time the act was passed. Even if it be conceded that the Legislature by the acts referred to may have possibly anticipated the future operation of nonsteam trains or motor cars by steam railroads, there is nothing in the language of those acts or the Full Crew Law to indicate that the Legislature knew or could have known the character of operatives that would be employed or necessary to a safe operation of such trains or motor cars, and for these reasons such matters were left for future legislation. The rule here invoked is well stated in 25 R. C. L. 971, as follows: "Although the language of a statute is general it may be limited in its operation to cases falling within the mischief intended to be remedied. It is to be presumed that the legislature does not intend to make any alteration in the law beyond what it explicitly declares, either in express terms or by unmistakable implication; or, in other words, beyond the immediate scope and object of the statute. In all general matters beyond, the law remains undisturbed. It is in the last degree improbable that the legislature would overthrow fundamental principles, infringe rights, or depart from the general system of law, without expressing its intention with irresistible clearness; and to give such effect to general words simply because, in their widest and perhaps natural sense, they have that meaning, would be to give them a meaning in which they were not really used. It is therefore an established rule of construction that general words and phrases, however wide and comprehensive in their literal sense, must be construed as strictly limited to the immediate objects of the act, and as not altering the general principles of the law."

Second, since the purpose of the statute under construction is not only remedial in its nature, but penal as well, it must be construed with a reasonable degree of strictness. The rule need not be extended so as to exclude from the terms of the statute operations clearly within its scope and purpose and intended to be covered; but it must be so applied as not to broaden the scope and to include operations not within the legislative intent; and, unless it is reasonably apparent from the language of the act that any given operation is an offense against the statute, persons performing such operation ought not be subjected to the penalties prescribed, or, as is said in 25 R. C. L. 1016: "Although a penal statute cannot be extended by construction, it should, if possible, receive such a construction as, when practically applied, will tend to suppress the evil which the legislature intended to prohibit. But, while a court in construing a penal statute is not required to shut its eyes to notorious mischiefs which it was intended to suppress, care must be observed not to extend the statute to offenses not embraced within its language, merely because they involve the same mischief which the statute aimed to suppress. It is a well accepted rule that remedial statutes, seeking the correction of recognized errors and abuses in introducing some new regulation for the advancement of the public welfare, should be construed with regard to the former law, and the defects or evils sought to be cured, and the remedy provided."

The rule finds support in the recent case of McBoyle v. U. S., 283 U. S. 25, 51 S. Ct. 340, 75 L. Ed. 816, opinion of Mr. Justice Holmes, where the question involved was whether the National Motor Vehicle Theft Act (18 USCA § 408), prohibiting transportation of "any other self-propelled vehicle not designed for running on rails," applied to transportation of an airplane. The Supreme Court, holding that the act did not apply even though the airplane was a self-propelled vehicle not running on rails, says:

"The question is the meaning of the word 'vehicle' in the phrase 'any other self-pro-

pelled vehicle not designed for running on rails.' No doubt etymologically it is possible to use the word to signify a conveyance working on land, water or air, and sometimes legislation extends the use in that direction, e. g., land and air, water being separately provided for, in the Tariff Act, September 21, 1922, c. 356, § 401 (b), 42 Stat. 858, 948 (19 USCA § 231 (b). But in everyday speech 'vehicle' calls up the picture of a thing moving on land. Thus in Rev. St. § 4 (1 USCA § 4) intended, the Government suggests, rather to enlarge than to restrict the definition, vehicle includes every contrivance capable of being used 'as a means of transportation on land.' And this is repeated, expressly excluding aircraft, in the Tariff Act, June 17, 1930, c. 497, § 401 (b), 46 Stat. 590, 708 (19 USCA § 1401). So here, the phrase under discussion calls up the popular picture. For after including automobile truck, automobile wagon and motor cycle, the words 'any other self-propelled vehicle not designed for running on rails' still indicate that a vehicle in the popular sense, that is a vehicle running on land is the theme. It is a vehicle that runs, not something, not commonly called a vehicle, that flies. Airplanes were well known in 1919 when this statute was passed, but it is admitted that they were not mentioned in the reports or in the debates in Congress. It is impossible to read words that so carefully enumerate the different forms of motor vehicles and have no reference of any kind to aircraft, as including airplanes under a term that usage more and more precisely confines to a different class. The counsel for the petitioner have shown that the phraseology of the statute as to motor vehicles follows that of earlier statutes of Connecticut, Delaware, Ohio, Michigan and Missouri, not to mention the late Regulations of Traffic for the District of Columbia, Title 6, c. 9, § 242, none of which can be supposed to leave the earth.

"Although it is not likely that a criminal will carefully consider the text of the law before he murders or steals, it is reasonable that a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed. To make the warning fair, so far as possible the line should be clear. When a rule of conduct is laid down in words that evoke in the common mind only the picture of vehicles moving on land, the statute should not be extended to aircraft simply because it may seem to us that a similar policy applies, or upon the speculation that if the legislature had thought of it, very likely broader words would have been used. United States v. Bhagat Singh Thind, 261 U. S. 204, 209, 43 S. Ct. 338, 67 L. Ed. 616."

The foregoing quotation finds application here from the fact that appellants insist that the term "any passenger train," as used in the Full Crew Law, is broad enough to include motor cars. But the passenger train, as above pointed out, that the Legislature had in mind, was one operated by a full crew of four persons, named and defined as one engineer, one fireman, one conductor, and one brakeman, which necessarily implied a passenger train propelled by a steam locomotive. If the Legislature had in mind a gasoline motor car or train, it could have easily said so, and we believe it would have done so by appropriate language, and in absence of which we will not extend the scope of the act to include motor cars of the character involved in this suit.

Another general rule of statutory construction, or rule in aid thereof, is that the interpretation which has been placed upon a statute by the officers or governmental department charged with carrying out or enforcing the terms of the law will be accorded due consideration by the courts in construing the law. This rule, of course, presupposes doubt or ambiguity in the language of the statute, in which case courts may resort to contemporaneous construction which it has received from contemporary authority. 25 R. C. L. 957. This rule is often applied where it is not plain from the terms of the statute that it was intended to include an agency, thing, or enterprise not in existence at the date of its passage. The reason for the rule is stated in 25 R. C. L. 1043, as follows: "It is obvious that the language of a statute must be understood in the sense in which it was understood when it was passed, and those who lived at or near the time when it was passed may reasonably be supposed to be better acquainted than their descendants with the circumstances to which it had relation as well as with the sense then attached to the legislative expression."

We have stated above in detail the history of the statute in question, its interpretation by the Attorney General's department for twenty-two years as having no application to passenger trains other than those operated by steam locomotives, which construction has been at least acquiesced in by the state labor commissioner, the Railroad Commission' and the various district attorneys in this state, all of whom are charged with the enforcement of the law, either as a remedial act or as a penal statute. It has also been noted that the Legislature passed the law at least three times without change in language, viz. in 1909, and in recodifying the statutes in 1911 and 1925. The departmental construction was uniform until 1929, when the Attorney General's department construed the statute applicable to the gasoline, electric, and gasoline-electric motor cars involved here, precipitating this litigation. In view of the fact that the Legislature thrice re-enacted the

law without change of language, and in the light of the uniform construction by all executive departments and officers charged with the enforcement of the law, we think the trial court correctly adopted that construction as conclusive of the intention of the Legislature with respect to the law being only applicable to steam-drawn passenger trains.

The Commission of Appeals in answering a certified question to the Supreme Court, in the recent case of Stephens County v. Hefner, 118 Tex. 397, 16 S.W.(2d) 804, 805, review the authority with respect to the contemporaneous rule of construction, as follows:

"In the interpretation of re-enacted statutes, Mr. Sutherland, in his excellent work on Statutory Construction, vol. 2, § 403, says: 'The court will follow the construction which they receive when previously enforced. The Legislature will be presumed to know the effect which certain statutes originally had and by re-enactment to intend that they should again have the same effect.'

"In Johnson v. Hanscom, 90 Tex. 328, 38 S. W. 761, 763, our Supreme Court, speaking through Mr. Justice Gaines, announced a similar rule in this language: 'It is to be presumed that the Legislature knew of the construction that had been placed upon the text, and that if they were not satisfied with it they would have so changed the verbiage as to have shown clearly a contrary intention.'

"The rule so announced has been frequently held to apply to the re-enactment of a statute which has received a practical construction upon the part of those called on to execute it. Houston & T. C. R. Co. v. State of Texas, 95 Tex. 521, 68 S. W. 777; Galveston, H. & S. A. R. Co. v. State, 81 Tex. 602, 17 S. W. 67; Bloxham v. Consumers' Electric Co., 36 Fla. 519, 18 So. 444, 29 L. R. A. 507, 51 Am. St. Rep. 44; Commonwealth v. Grand C. B. & L. Ass'n, 97 Ky. 325, 30 S. W. 626; State v. Moore, 50 Neb. 88, 69 N. W. 373, 61 Am. St. Rep. 538.

"It appears that the Attorney General's department, in the discharge of its duty in advising county officers, with one exception, has uniformly construed article 3898 as having the effect of exempting all officers in counties of less than the number of inhabitants specified therein from the maximum salary provision of the fee bill. The rulings of that department have been acted upon by public officers throughout this state for practically a quarter of a century. The single exception to the rule was made by the Attorney General in 1914. An examination of that opinion, however, discloses an admission by the then Attorney General that the effect of section 17 of the Act of 1897 was to exempt officers in counties of less population than 15,000 from the maximum salary provision of the act. It was asserted by the Attorney General that the amendment of 1913 had the effect of placing said officers under the maximum salary provision. The opinion does not cite, and we are left to conjecture, what particular provision of the Act of 1913 had this effect. After a most careful consideration of this act, we do not find any provision which in our opinion sustains the ruling of the Attorney General. In the succeeding administrations of that department, this opinion was overruled and the uniform construction theretofore placed upon said act was resumed, and such construction continued up to the date of the repeal of article 3898 by the Act of 1919. After this repeal it was held by the Attorney General that by reason thereof all county officers named in the fee bill were subject to the maximum salary provision. When the Legislature in 1923 re-enacted article 3898, couched in the identical language in which it was a part of the statutes of this state for 22 years, it did so with presumptive knowledge of the fact that, the latest ruling by the executive department of the state was that the effect of said provision was to exempt certain officers from the maximum salary provision, and that under the practical construction placed upon said article county officers in several hundred counties were retaining all of the fees collected by them on the theory that they were permitted to do so by such article; hence it must be assumed that the Legislature intended by the re-enactment of article 3898, unchanged in verbiage, that it should be given the construction theretofore placed upon it by public officials throughout the State. If it had been intended that the re-enacted article should have a different effect, the Legislature no doubt would have used language too clear and plain to be misunderstood to indicate such intention."

The above quotation is also in point here with respect to the effect to be given the re-enactment of the Full Crew Law by the Legislature in the light of the long-continued construction placed upon it by the executive department of the government, and from which "the legislature will be presumed to know the effect which certain statutes originally had and by re-enactment to intend that they should again have the same effect."

In this connection appellants contend that the statement in the Hefner Case that "the legislature will be presumed to know the effect that certain statutes originally had and by re-enactment to intend that they should again have the same effect" is too broad, and that no such knowledge on the part of the Legislature can be presumed. We do not concede the correctness of this contention, but, aside from the rule stated, it is clear that the Legislature was aware at least in 1925, when it recodified the statutes, that numerous gasoline or gasoline-electric motor cars were being operated daily over many steam railroads in this state without the aid of a

fireman. Such railroads and their operations have been under supervision of state authority since 1876. The operations of motor cars have not been a secretive undertaking. As above pointed out, the matter of the application of the Full Crew Law to motor cars has been called to the attention and obtained the rulings of the executive departments charged with the enforcement of the law for a long period of time, all of which was well calculated to direct the attention of the Legislature to the matter, and indicates that the Legislature did not intend that motor cars should be included within the term "any passenger train." Furthermore, the fact that the Legislature did not intend that the Full Crew Law should not or did not apply to motor cars is made conclusive by the enactment in 1925 of Chapter 154, Acts 39th Legislature, dealing with daily operations of passenger trains, where it was declared in the emergency clause that the operation of "a gasoline or electric motor car ⁎ ⁎ ⁎ shall be deemed a train within the meaning of this Article." The reasonable conclusion to be drawn from this language is that as late as 1925 the Legislature did not consider motor cars as passenger trains within the meaning of the Full Crew Law, and from this it is manifest that the Legislature never at any time intended to include them within the prohibition of that law against the operation of a passenger train without a full crew of four persons consisting of one engineer, one fireman, one conductor, and one brakeman.

The judgment of the trial court will be affirmed.

Affirmed.