STATE OF MAINE *vs.* BOSTON AND·MAINE RAILROAD COMPANY.

Cumberland.   Opinion June 21, 1923.

*The mileage and transportation receipts of an electric railway, leased, or owned by, or*
*merged with a steam railroad company should not be added to and included*
*in the mileage and transportation receipts of such steam railroad,*
*·for purposes of taxation under statutory provisions for*
*railroad taxation.*

In the instant case, before the alleged merger, the mileage in question was street
   railroad mileage, the railroads being street railroads.   They were different in
   nature, in condition and class from steam railroads.   Can a merger, if actually
   accomplished, constitute an electric street railway a part of a line of commercial
   steam railroad so to actually include the mileage of the former as an extension
   of the latter's line or system under.the laws of Maine?   We find no authority or
   reason for such inclusion, and therefore hold that it does not.

The electric roads operate as in the beginning, and their business is kept distinct
   and separate from the business transactions and records of the main line of
   defendant's railroad.

The roads have a common ownership but no business in common, no interchange
   of business by cars or motive power, or common use of stations or roadbed.

The merger lacks the physical qualities which would exist in case of a merger of
   two corporations of like character, condition and class, and which in the case
   of two steam railroads would leave no question as to whether the mileage
   would be increased under the law.

On report on an agreed statement.   An action of debt to recover ,a
balance of excise taxes alleged to be due·from defendant corporation
for taxes assessed against it by the State Assessors" for the years
1916, 1917 and 1918.   The assessors computed the taxes for each of
said years upon the basis of the mileage and transportation receipts
of the steam railroad alone, excluding all the electric railway mileage
operated by defendant.   Counsel for defendant contended that in
computing such tax the total mileage of the roads, both steam and
electric, and the total transportation receipts from both should be
taken into account.   The case was reported to the Law Court upon
an agreed statement of facts.   Judgment for the State.

The case is fully stated in the opinion.

*Ransford W. Shaw, Attorney General and William H. Fisher, Deputy Attorney General,* for the State.

*Charles B. Carter, of White, Carter & Skelton, and Thornton Alexander,* for defendant.

SITTING: CORNISH, C. J., SPEAR, HANSON, PHILBROOK, DUNN, MORRILL, WILSON, DEASY, JJ.

MORRILL, J., dissenting. DUNN, J., concurring in dissenting opinion.

HANSON, J. This is an action of debt to recover a balance of excise taxes claimed to be due the State from the defendant for the years 1916, 1917 and 1918, and comes before the court on report on an agreed statement of facts.

From the agreed facts it appears that on the thirtieth day of June, A. D., 1915, and for twelve months prior thereto, the defendant company operated an average total mileage of steam and electric railroads of two thousand three hundred one and ninety one hundreths (2,301.90) miles, two thousand two hundred fifty-one and sixty-nine one hundredths (2,251.69) miles thereof being operated by steam, and fifty and twenty-one one hundredths (50.21) miles thereof being operated by electricity. An average total railroad mileage so operated during said period within the State of Maine was one hundred fifty-nine and forty-seven one hundredths (159.47) miles, all said mileage being operated by steam, the mileage operated by electricity being outside the State of Maine.

The tax actually assessed by the State Assessors upon the defendant company for the year 1916 was one hundred seventy-six thousand, two hundred fifty dollars and thirty-one cents ($176,250.31). In computing said tax, the State Assessors excluded from their consideration all electric railroad mileage operated by the defendant company and all electric railroad transportation receipts derived therefrom. The defendant company paid to the State the tax according to the defendant company's computation but refused to pay the sum of two thousand nine hundred seven dollars and nine cents ($2,907.09) the difference between the State's method of computation and the defendant company's. It is agreed that if the said

electric mileage and transportation receipts were lawfully excluded by the State from the computation of the tax the sum of two thousand nine hundred seven dollars and nine cents ($2,907.09) is lawfully due from the defendant company to the State, together with interest thereon at the rate of ten per centum (10%) upon one half ($\frac{1}{2}$) thereof from July 1, 1916, and upon the remaining one half ($\frac{1}{2}$) thereof from October 1, 1916.

A similar difference of computation between the State and the railroad occurred in the tax year 1917 arising from the same. cause. This difference amounted to two thousand eight hundred sixty-two dollars and fifty cents ($2,862.50) assessed by the State Assessors over and above the defendant company's computation.

A similar difference arose from the same cause in the year 1918 amounting to three thousand five hundred sixty dollars and nineteen cents ($3,560.19).

The electric mileage excluded from consideration by the State, Assessors was originally that of the Concord Horse Railroad at Concord, N. H., constructed as a branch of the Concord & Montreal Railroad and electric mileage at Portsmouth, N. H.

Prior to the commencement of this suit all electrically operated mileage of the Boston and Maine Railroad Company had either been bought by the Boston and Maine Railroad Company and merged into it, or had been built by the Boston and Maine Railroad Company, and was owned, operated and controlled by the Boston and Maine Railroad Company. There is. no independent company, corporation or association owning, operating or maintaining said mileage, although in all cases the receipts and disbursements are kept separate upon the books of the Boston and Maine Railroad Company. None of the electric mileage was constructed or designed for either passenger or freight traffic by steam locomotives and there is no interchange of motive power or rolling stock between the steam operated and the electrically-operated mileage.

Some portions of said electric lines are on private rights of way, but the larger part of said electric lines follows and is located within the limits of the streets and highways of the cities and towns through which said electric lines operate.

It is stipulated that "If the basis of computing the aforesaid tax upon the defendant company's mileage as adopted by the State Assessors is incorrect in its exclusion of the mileage operated by

electricity and the transportation receipts derived therefrom, then judgment should be rendered for the defendant with costs. If such basis of computation is correct, then judgment should be rendered for the State in the amount of two thousand seven hundred nine dollars and seven cents ($2,709.07) with interest upon one half ($\frac{1}{2}$) thereof at ten (10) per centum from the 1st day of July, 1916, and upon the balance from the 1st day of October, 1916; two thousand eight hundred sixty-two dollars and fifty cents ($2,862.50) with interest at ten (10) per centum, upon one half ($\frac{1}{2}$) thereof from the 1st day of July, 1917, and upon one half ($\frac{1}{2}$) thereof from the 1st day of October, 1917, three thousand five hundred sixty dollars and nineteen cents ($3,560.19) with interest at ten (10) per centum, upon one half ($\frac{1}{2}$) thereof from the 1st day of July, 1918, and upon one half ($\frac{1}{2}$) thereof from the 1st day of October, 1918, with costs."

Chapter 91, Public Laws of 1881, the original statute, provided for an excise tax on railroads, a tax to be levied against "every corporation, person or association operating any railroad in this state." At that time there were no electric street railroads in the State.

By Chapter 150 of the Public Laws of 1883, horse railroad corporations and associations were made subject to the provisions of the foregoing, except in the manner of ascertaining the tax.

Further amendments were made in 1887, 1901 and 1909, and are now incorporated in the R. S., of 1916, hereinafter quoted, Sec. 32 of Chap. 9 thereof being an adaptation of Chap. 150, Laws of 1883, relating to horse railroads, and now relating to street railroad corporations or associations.

The statutes involved are quoted at length as follows:

Sec. 26, Chap. 9, Revised Laws of 1916, which was in force at the time the taxes in question were assessed, reads:

"Every corporation, person or association, operating any railroad in the state under lease or otherwise, shall pay to the Treasurer of State for the use of the State, an annual excise tax, for the privilege of exercising its franchises and the franchises of its leased roads in the state, which, with the tax provided for in section four of chapter ten, is in place of all taxes upon such railroad, its property and stock. There shall be apportioned and paid by the state from the taxes received under this and the five following sections and *under section thirty-two*, to the several cities and towns in which, on the first day of April in each year, is held railroad stock *of either such operating or*

*operated roads* exempted from other taxation, an amount equal to one per cent. on the value of such stock on that day, as determined by the board of State Assessors." . . . .

Section 4 of Chapter 10 provides as follows: "The buildings of every railroad corporation or association, whether within or without the located right of way, and its lands and fixtures outside of its located right of way, are subject to taxation by the cities and towns in which the same are situated, as other property is taxed therein, and shall be regarded as non-resident land."

R. S., Chap. 9, Sec. 27, provides: "The amount of such annual excise tax shall be ascertained as follows: The amount of the gross transportation receipts as returned to the public utilities commission for the year ending on the thirtieth day of June preceding the levying of such tax, shall be divided by the number of miles of railroad operated, to ascertain the average gross receipts per mile; when such average receipts per mile do not exceed fifteen hundred dollars, the tax shall be equal to one half of one per cent of the gross transportation receipts; when the average receipts per mile exceed fifteen hundred dollars and do not exceed nineteen hundred dollars, the tax shall be equal to three quarters of one per cent. of the gross receipts, and so on increasing the rate of tax one quarter of one per cent. for each additional four hundred dollars of average gross receipts per mile or fractional part thereof; provided, that the rate in no event exceed five and one half per cent., and in *case of railroads operated exclusively for the transportation of freight,* said rate shall in no event exceed three per cent. When a railroad lies partly within and partly without the State, or is operated as a part of a line or system extending beyond the state, the tax shall be equal to the same proportion of the gross receipts in the state, as herein provided, and its amount shall be determined as follows: The gross transportation receipts of such railroad, line or system, as the case may be, over its whole extent, within and without the state, shall be divided by the total number of miles operated to obtain the average gross receipts per mile, and the gross receipts in the state shall be taken to be the average gross receipts per mile, multiplied by the number of miles operated within the state."

It will be seen that the distinction between the two classes of railroads is maintained in the latest revision of the statutes. Sections 25 to 31, inclusive, relate to steam railroads. Section 32 relates to

taxation of street railroad corporations, and provides that "Street railroad corporations and associations are subject to the seven preceding sections and to section four of chapter ten, except that the annual excise tax shall be ascertained as follows:   When the gross average receipts per mile do not exceed one thousand dollars the tax shall be equal to one fourth of one per cent. on the gross transportation receipts; and for each thousand dollars additional gross receipts per mile, or fractional part thereof, the rate shall be increased one fourth of one per cent., provided that the rate shall in no case exceed four per cent."

The preliminaries are the same for both kinds of railroads, but the vital question, the all-important question, as to ascertaining the amount of taxation is not the same.   This is all the more apparent when Section 32 is read in connection with that part of Section 36 which reads as follows:   "There shall be apportioned under this and the five following sections *and under section thirty-two,* to the several cities and towns," etc., etc.

If the Legislature did not intend to recognize two classes of railroads, resort would not have been had to subdivisions, and references noted.   The presence of which, and the coupling of the sections as noted above for the purpose of distribution to cities and towns, clearly demonstrates such legislative intent.

Between "railroads" (R. S., Chap. 56) and "street railroads" (R. S., Chap. 58), the statute makes and maintains an emphatic distinction.   In Chapter 9 relating to taxation the distinction is recognized.

The exact question is this:—The Legislature (having the power to impose a tax upon either basis) used in Chap. 9, Sec. 27, the words "total number of miles operated."   What did it mean by this phrase?   Miles of what operated?   Did it mean miles of railroad plus miles of street railroad operated?   Or did it mean miles of railroad?   The word "railroad" standing alone does not, as used in the statute, include street railroad.   Inasmuch as Section 27 and all that goes before relates exclusively to railroads and not at all to street railroads it is clear that it is the number of miles of "railroad" that the Legislature intended.

If the Boston and Maine Railroad Company had within the State of Maine a line precisely like those owned by it in New Hampshire, to wit, a trolley line both intra-urban and inter-urban, the larger

part of the rails laid in streets and having with the main line no inter-change of power or rolling stock, it would be taxed as a street railroad.

We should not treat such a line as a street railroad in Maine and as not a street railroad if located elsewhere. .

The principal question presented in the agreed facts follows: "It is agreed that the question whether the aggregate of the amounts (naming the same for the three years) together with interest thereon as stated, are lawfully due from the defendant company to the state depends entirely upon the legality of the exclusion by the State Assessors of the electric mileage and transportation receipts of the defendant company from its total mileage and transportation receipts." And to emphasize the point, the defendant's counsel, in his brief, restates the question: "Did the assessors of the State of Maine properly and legally exclude the electrically operated mileage of the Boston and Maine Railroad Company and the transportation receipts therefrom from the total mileage and total transportation receipts of the Boston and Maine Railroad Company?" It is contended by defendant's counsel that "The Boston and Maine Railroad Company, with but one charter and one franchise is an entity, indivisible, without alienation the component parts cannot be separated for the purposes of taxation."

As was said in the *Delaware Railroad Tax Case*, 18 Wall., 206, 231: "The state may impose taxes upon the corporation as an entity existing under its laws, as well as upon the capital stock of the corporation, or its separate corporate property; and the manner in which its value shall be assessed, and the rate of taxation, however, arbitrary or capricious, are mere matters of legislative discretion. . . . It is true as said by this court in *California* v. *Railroad Co.*, 127 U. S., 1, 41, that the taxation of a corporate franchise has no limitation but the discretion of the taxing power; and its value is not measured like that of property, but may be fixed at any sum that the legislature may choose. It may be arbitrarily laid, without any valuation put upon the franchise. If any hardship or oppression is created by the amount exacted, the remedy must be sought by appeal to the Legislature of the State. It cannot be furnished by the federal tribunals. The tax in the present case would not be affected if the nature of the property in which the whole capital stock is invested were changed, and put into real property or bonds of New York, or of other states. From the very nature of the tax, being laid upon a franchise given

by the State, and revocable at pleasure, it cannot be affected in any way by the character of the property in which its capital stock is invested. The power of the State over its corporate franchise, and the conditions upon which it shall be exercised, is as ample and plenary in the one case as in the other." Beale on Foreign Corporations, Page 665, citing Field, J. in *Home Ins. Co.* v. *New York*, 134 U. S., 594. It is true that the taxation is of the railroad as a unit; and that the measure of liability is determined by its length in miles and its gross earnings per mile of line. The defendant further urges that the electric railway mileage owned by it, and which it is claimed in some degree contributes to its earnings as a unit or line of railroad, should be added to its main line of railroad and included in its mileage for taxation purposes under our statute provisions for such railroad taxation. We are unable to adopt the construction contended for. No sufficient reason has been advanced for such conclusion. There is no statute authorizing the same, and the defendant has not cited an authority from any other jurisdiction so holding. That the Legislatures of the several States through which its trunk line runs have consented to the lease or ownership of the local electric roads named, does not change the character of the electric roads to that of a steam railroad, or increase the length of the same as such. That claim was not set up in the inception of the connection of the one with the others, nor was it the subject of legislative action in passing upon the matter when the consent to acquire the electric railways was granted. The rights granted must be determined by the language of the statute, and our conclusion is that no permissible rule of construction authorizes a finding that the Legislature of Maine intended so to legislate.

The trend of authority is against the theory that the character of a street or inter-urban railway may be changed by fiat. Such a conclusion would lead to the utmost confusion, and tend to unsettle established law and business dependent thereon.

The following quotation answers many questions arising in brief and arguments of counsel. "Generically the word 'railroad' includes all roads upon which the carriages or cars have wheels adapted to run, and which in operation do run upon metallic rails. The term includes tramways used in mining; it includes railroads in which the propelling power is steam, electricity, the horse or mule, and even those upon which push cars are propelled by men. A railroad and

a street railroad are, however, in both their technical and popular import, as distinct and different as a road and a street, or as a bridge and a railroad bridge. The word 'railroad,' as generally used, applies to commercial railways engaged in the transportation of freight and passengers for long distances, and as a general rule, having steam engines for motive power, and making stops at regular stations for the receipt and discharge of freight and passengers. When the word railroad is used in a statute there is no definite rule of construction as to whether it includes street railroads. It may or it may not include them. The meaning of the word must depend upon the context and the general intent of the statute in which it is used. The applicability of such acts is also to be determined by a fair interpretation of the act, taking into consideration the date of its passage and the evil intended to be remedied thereby. So a statute enacted prior to the construction of electric railways which in terms applies to railroads may be held not to apply to electric street or interurban railways." 25 R. C. L., 1120; *Smalley* v. *Riley County*, 86 Kan., 752; 121 Pacific, 1108; Am. Cas., 1913, C. 576. It has also been held that the term "railroads" is not to be interpreted to include street railways when the purpose of the statute was taxation. 25 R. C. L., 1121; *State* v. *Duluth Gas etc. Co.*, 76 Minnesota, 96; 78 N. W., 1032; 57 L. R. A., 63. In *Funk, Adm'r.* v. *St. Paul City R. Co.*, (Minn.), 29 L. R. A., 209, the court say: "It is claimed by appellant's counsel, and not denied by the counsel for the respondents, and such we believe the fact to be, that on February 24, 1887, when the general law of that year was passed, there were no cable or electric street railways in existence in this State. If so, what was the legislative intent in using the word 'railroad' in the law of 1887, to be deduced from the whole or from part of the statute taken together, upon the subject of railroads?

"When the words of a statute are not explicit, the intention is to be collected from the context, from the occasion and necessity of the law, from the mischief felt and the object and remedy in view. . . . What was the mischief felt which resulted in the passage of the law? Was it a danger known or one unknown? Was it a danger then felt or realized, or one that might possibly arise in the future? We must assume that it was dealing with and acting upon existing facts within its knowledge."

The construction which has been placed upon a statute by the officers or governmental department charged with carrying out the provisions of the law is to be accorded due consideration by the courts in construing the statute. 25 R. C. L., 957. In case of doubt as to the meaning of a statute it is well settled that the courts may resort to contemporaneous construction, and it has been said that the best construction of a statute is that which it has received from contemporary authority. . . . . If there is ambiguity in the language, the understanding and application of it when the statute first comes into operation, sanctioned by long acquiescence on the part of the Legislature and judicial tribunals, are the strongest evidence that it has been rightly explained in practice. Idem, Page 1043. Lewis Sutherland Statutory Construction, 472. This court has not heretofore placed a construction upon the Statute of 1881 involved as relating to the question herein raised. There was no ambiguity or obscurity calling for judicial construction. The introduction of street railways came some years later, and the interest and ownership of the defendant in street railroads in connection with its business began later still. It is therefore clear that the legislative intent could not have been to include street railways as within the meaning of Chapter 91 of the Laws of 1881. This is plain from the terms of the statute and the date of its passage. In the absence of ambiguity and uncertainty, the rules of construction can have no application. The legislative intention is plain, from the nature of the case. It cannot be said that the statute was intended to include an agency or enterprise not in existence at the date of its passage. "It is obvious that the language of a statute must be understood in the sense in which it was understood when it was passed, and those who lived at or near the time when it was passed may reasonably be supposed to be better acquainted than their descendants with the circumstances to which it had relation as well as with the sense then attached to the legislative expression. 25 R. C. L., 1043, and cases cited."

"The true rule is that statutes are to be construed as they were understood when they were passed. . . . . If the language used is broad enough to include unknown things which might spring into existence in the future, they would be deemed to come within, and be subject to, the evident meaning of the terms used, but it does not follow, when a newly discovered thing is called by a familiar word,

which comes nearest expressing the new idea, that the thing so styled is really the thing formerly meant by the familiar word. Hence it has been held that a statute passed at a time when there were no cable or electric street railways in existence in the State, and providing that every railroad corporation owning and operating a railroad in the State should be liable for damages sustained by an agent or servant by reason of the negligence of any other servant or agent, but not broad enough in words to include unknown things, is not applicable to a street railway corporation, although its line is operated by cable." 25 R. C. L., 959, citing *Funk* v. *St. Paul City R. Co.,* 61 Minn.; 435; 29 L. R. A., 208 note.

Counsel urges as well that the unification of the different railroad corporations in question was in fact and in law a merger, and that the merger accomplished, the right to include the electric mileage for taxation purposes attached. Whether under the laws of other states the merger claimed would be held to constitute the electric roads in question a part of the line or system, has been passed upon as relates to a domestic railroad wherein the distinction between the two classes of railroads here involved is closely drawn in language the force of which is at once recognized, and is conclusive from the very nature of the subject under discussion. "In New Jersey a domestic railroad corporation operating a steam surface railway between two cities, and still occasionally using its railroad tracks upon the highways of one of such cities for steam surface railroad purposes; and which in the same connection owns a power-house, poles, dynamos, cars, and other equipment of an electric passenger railway operated over the same tracks in such city,—is to be assessed and taxed by the State Board of Assessors upon its tracks and franchise, and by the municipality upon the electric line and its equipment as property not used for railroad purposes." *Camden & A. R. Co.* v. *Atlantic City,* 58 N. J. L., 316, 33 Atl., 198.

In the above case, the court say: "Regarded historically, the tracks and occupancy of the roadbed by the Camden & Atlantic Railroad, including the franchise to operate its railroad thereon, must be deemed railroad uses, which the testimony shows are still maintained by occasional freight trains and steam engines. The electric system, however, has no such history, and must be judged in the light of its admitted character, irrespective of its ownership. The power-house and lot of land, the dynamos, poles, wires, and cars

of this trolley line, possess no feature that can distinguish them from any other electric system of street railways.    The fact that they are the property of a railroad company, and that they are run over the tracks of such company, while suggestive of certain legal questions, cannot obscure the patent fact that it is a street railway, pure and simple, with which we have to deal, whose passengers are such by independent contract, and whose mechanical operation is that of all of its class.    The application of any practical test discloses the independent character of this class of property.    Thus, supposing the steam railroad company should sell the disputed property to a street railway company, what railroad purpose would thereupon cease to be subserved?

"Passengers who now take the surface lines to reach the railroad are obliged to pay ordinary car fare.    The surface line is not operated in connection with one railroad more than another, not with a carrying company more than with places of amusement or other points of destination.

"On the other hand, supposing the present owner should cease to operate its railroad to Atlantic City, what change would be effected in the purposes to which its electric railway would be put?

"It would carry passengers throughout the city for profit, as it now does, the only conceivable difference being a change in the destination of a certain number of its patrons.

"No other conclusion seems possible than that the tangible property in question was properly taxed by Atlantic City as property not used for railroad purposes." 57 L. R. A., 106.

Until authorized by special act to lease or buy the electric railways, the Boston and Maine R. R. Co. had no legal right to operate such railways.    This was not included in their chartered rights.    Under enabling statutes it has acquired the electric railways, and may operate the same, as it might operate a hotel, or steamboat, or ferry, or do other authorized acts as accessory to its business, but like the instances mentioned such acquisition cannot be held to add to its mileage as a railroad and extend the line or system of railroad for purposes of taxation.    22 R. C. L., 827; *State* v. *Canadian Pacific R. R.*, 100 Maine, 202.    "A railroad company may own and control steamboats for the purpose of transferring its freight and passengers across navigable water on the line and constituting part of its route,

and those lying at the end of its road separating it from ostensible and substantial termini of its route." 32 Cyc., 72-73. Note 45, and cases cited.

"A railroad company may engage in any business-authorized by its charter or governing statute, and in any business that is incidental or auxiliary to powers granted, and which may become necessary and expedient in the care and management of its main business." 33 Cyc., 71.

The following citations of settled law are opposed to the claim of defendant:

"A railroad either constitutes a highway, or if a street railway, forms part of one." Baldwin American Railroad Law, 211.

"No state has the power to tax a franchise it has not conferred." *State* v. *Duluth Gas & Water Company,* 76 Minn., 96, and cases cited. Note 6 c.

"A steam railroad operating under a charter authorizing a steam railroad may be extended as a steam railroad, but it cannot be extended as a street railroad." 33 Cyc. 73, citing *Cincinnati Incline Penn R. Co.* v. *Cincinnati,* 7 Ohio, N. P., 541.

"The fact that a railroad becomes an interurban railroad when it leaves the city limits does not prevent it from being a street railroad within such limits." 36 Cyc. 1346, note.

"As no state is under obligation to permit a foreign corporation to carry on business or exercise franchises within its territory, the permission to do so may be granted under such restrictions, or permitted on such conditions, regarding taxation as the state may think proper or prudent to impose." Cooley Taxation, Chapter 3, Page 57.

The permission in this State was in view of a trunk line established and doing business as a steam railroad.

"If a doubt arise as to the intent of the legislature, that doubt must be solved in favor of the state." *Delaware Tax Case,* infra.

"When used by the Legislature, unqualified by any other word, 'railroad' is construed as referring exclusively to ordinary commerical railroads; while, on the other hand, when it is intended to refer to street railroads, they have qualified the words by the prefix 'street'." *State* v. *Duluth Gas & Water Co.,* 78 N. W., 1032, 76 Minn., 96, 57 L. R. A., 63.

"When it is sought to bring a particular line within the statutory scope of either the words 'railroad' or 'railway,' the controlling factor is the legislative intent. In accordance with that intent the line must be included or excluded." 22 R. C. L., 745; *Bloxam* v. *Consumers' Electric Light, etc. R. Co.*, 36 Fla., 519, 18 So., 444; 51 A. S. R., 44; 29 L. R. A., 507.

"Railroad property. The property which is essential to a railroad company to enable it to discharge its functions and duties as a common carrier by rail. 32 Cyc., 1471; *Northern Pacific R. Co.* v. *Walker*, 47 Fed., 681-685. See also 48 Atl., 601; *In re Erie R. Co.* v. *Alford*, 168 U. S., 651, 665."

In *Pacific Express Company* v. *Siebert*, 142 U. S., 351, the court say: "This court has repeatedly laid down the doctrine that diversity of taxation, both with respect to the amount imposed and the various species of property selected either for bearing its burdens or for being exempt from them, is not inconsistent with a perfect uniformity and equality of taxation in the proper sense of those terms; and that a system which imposes the same tax upon every species of property, irrespective of its nature or condition or class, will be destructive of the principle of uniformity and equality in taxation and of a just adaptation of property to its burdens." Citing *Bell's Gap Railroad* v. *Pennsylvania*, 134 U. S., 232, 237. The established rule of construction is that rights, privileges and immunities not expressly granted are reserved. There is no safety in public interests in any other rule. And with special force does the principle upon which the rule rests apply when the right, privilege or immunity claimed calls for an abridgement of the powers of the government, or any restraint upon their exercise. The power of taxation is an attribute of sovereignty, and is essential to every independent government. As this court has said, the whole community is interested in retaining it undiminished, and has a right to insist that its abandonment ought not to be presumed in a case "in which the deliberate purpose of the State to abandon it does not appear." The *Delaware R. R. Tax*, 18 Wall., 225, citing *Providence Bank* v. *Billings*, 4 Peters, 561.

Before the alleged merger, the mileage in question was street railroad mileage, the railroads were street railroads. They were different in nature, in condition and class from steam railroads. Can a merger, if actually accomplished, constitute an electric street railway a part of a line of a commercial steam railroad so to actually

include the mileage of the former as an extension of the latter's line or system under the laws of Maine? We find no authority or reason for such inclusion, and therefore hold that it does not. Here the ownership changed, and extensions were made in the electric mileage, but aside from the fact and acts of purchase, the passing of the necessary documents to accomplish the sale and transfer, no physical change was made by defendant in its own railroad or in the acquired electric railroads in view of the alleged merger. The electric roads operate as in the beginning, and their business is kept distinct and separate from the business transactions and records of the main line of defendant's railroad. The roads have a common ownership but no business in common, no interchange of business by cars or motive power, or common use of stations or roadbed. The merger lacks the practical physical qualities which would exist in case of a merger of two corporations of like character, condition and class, and which in the case of two steam railroads would leave no question as to whether the mileage would be increased under the law. It lacks the combination of effort and aims, of concentration of capital and labor upon the objects and business of the larger corporation in which the other is merged, and which continues in business after it has absorbed the other.

For the reasons stated we hold that there has been no change in the status of the electric roads which in any way changes the liability of the defendant for its excise taxes as heretofore assessed and collected.

The entry will be,

> *Judgment for the State, the amount to be figured by the clerk in accordance with the stipulation in the agreed statement of facts.*
> *So ordered.*

Morrill, J. Dissenting. As appears by the agreed case, the right of the State to recover in this action "depends entirely upon the legality of the exclusion by the State Assessors of the electric mileage and transportation receipts of the defendant company from its total mileage and transportation receipts." That is the issue concisely stated; it is not disputed that the defendant is liable for an excise tax under R. S., Chap. 9, Sec. 26, to be assessed in the manner

prescribed by the last sentence of R. S., Chap. 9, Sec. 27. The decision must depend upon the construction of that statute as applied to the facts of the case.

I am unable to find any warrant of law for the exclusion of that portion of the "gross transportation receipts" and a part of the mileage, of the defendant which was excluded by the Board of State Assessors in assessing the taxes in question.

The statute was first enacted in 1881, Chapter 91 of the laws of that year; the language applicable to the  method of assessing the tax upon a corporation operating a railroad lying "partly within and partly without the state," or which "is operated as a part of a line or system extending beyond the state" is the same in the statute in force today as in the original statute; it has remained unchanged— "The gross transportation receipts of such railroad, line or system, as the case may be, over its whole extent, within and without the state, shall be divided by the total number of miles operated" etc.

I think that the words "railroad, line or system" are to be construed together in connection with the subject matter to which they relate, and that the phrase, "gross transportation receipts of such railroad, line or system, as the case may be, over its whole extent," means precisely what the words would ordinarily imply, and would ordinarily be understood to mean—the gross receipts derived from transportation by rail over the whole extent of such railroad, line or system. This construction is in entire harmony with the opinion of this court in *State* v. *Canadian Pacific Railway Company*, 100 Maine, 202.

The language of the statute, under which the tax in question was assessed, unchanged since its first enactment, is broad and general enough to include any kind of railroad corporation. "Every corporation, person or association, operating any railroad in the state under lease or otherwise, shall pay" etc., is the language of Section 26. "When a railroad lies partly within and partly without the state, or is operated as a part of a line or system extending beyond the state," is the language of Section 27. Clearly this language is comprehensive enough to include the railroad lines excluded by the State Assessors, unless a contrary intent clearly appears; the character of those lines, which will be considered later, emphasizes this conclusion.

The learned Attorney General, however, contends that the Legislature has placed street railroad corporations in a class by themselves, and that this classification justifies the action of the Board of State Assessors in the instant case.

An examination of the history of Section 27 of Chapter 9 shows that it does not lend support to such conclusion, but, if it has any bearing on the question, rather negatives any authority for the action of the State Assessors. The original statute (Public Laws, 1883, Chapter 150) read, "Horse railroad corporations and associations are hereby made subject to the provisions of the act entitled 'An Act relating to the taxation of railroads,' approved March seventeen, one thousand eight hundred and eighty-one, except" etc. It is obvious that the act had two purposes only in view, viz.: To remove any doubt which might exist as to the right to tax under the Act of 1881 the horse railroad corporations of that day which operated in the comparatively restricted areas of city streets, and to fix a rate of taxation which would be just towards corporations of that class. It was a statute of inclusion, not of exclusion. In 1901, with the substitution of electricity as the motive power for the cars of such corporations, the law was amended (Public Laws, 1901, Chapter 156) so as to read in its present form, "Street railroad corporations" etc., but nothing indicates any intended change in its scope. As the law now stands, corporations operating street railroads are completely subject to the provisions of Sections 25 to 31, both inclusive, of Chapter 9, except as to the rate; if a corporation operates a street railroad lying "partly within and partly without the state, or as a part of a line or system extending beyond the state," it is taxed in the manner provided in the last part of Section 27 at the rate named in Section 32. There is no reference in the statute to the taxation of a corporation operating both classes of railroads. The corporation is taxed "for the privilege of exercising its franchises and the franchises of its leased roads in the state"; if it exercises a street railroad franchise in the State, it is taxed at the rate named in Section 32; if it exercises a general, or as sometimes called, commercial, railroad franchise, it is taxed at the rate named in Section 27; in both cases the basis of taxation is the "gross transportation receipts of such railroad, line or system as the case may be, over its whole extent, within and without the state" divided by "the total number of miles operated"; there is no mention of motive power. Here there is no authority for the exclusion of the receipts and mileage which were disregarded in the instant case. This becomes apparent upon a study of the history and character of the lines whose receipts and mileage was excluded.

Those lines are not street railroads as the term is usually understood, but are inter-urban railroads, so called, transporting both persons and property, operated by legislative requirement in one case, and by legislative sanction in the other, as component parts of the Boston & Maine Railroad.

The type is familiar, and the law will be found discussed in *Diebold v. Kentucky Traction Company,* 117 Ky., 146; 111 Amer. St. Rep., 230; 77 S. W., 674; construing a statute of Kentucky relating to so-called "trunk railways." Other authorities may be found in 4 A. & E. Anno., Cas. 451, and 28 A. & E. Anno., Cas., 1913C, 583.

We are not concerned here with the perplexing question alluded to in the opinion, whether the franchises of corporations operating railroads of the type excluded in this case are taxable under Section 27 or under Section 32. The tax in question was assessed under the former section, not under the latter, and it is conceded that the defendant is liable to taxation under the former. Nor has the Legislature devised any scheme whereby interstate railroad corporations operating both commercial railroads and street railroads, or railroads, like the lines excluded in this case, combining the characteristics of both, may be taxed upon the basis of the gross receipts and mileage of each class of road. The tax is to be based upon gross transportation receipts of the railroad, line or system over its whole extent divided by its total mileage.

The question is, whether there is any authority of law for the action of the Board of State Assessors in excluding the transportation receipts and mileage of the electrically-operated lines in question from the gross transportation receipts and total mileage of the Boston & Maine Railroad, when assessing a tax under Section 27 upon the defendant as operating an interstate railroad. The difference in motive power is not a factor. With the present day application of electricity to commercial railroads formerly operated wholly by steam such distinction is no longer, if ever, applicable.

Nor is the type of car a factor. Today on many steam operated railroads single or unit cars, generating their own motive power, are in use for transportation of persons and property in sparsely settled sections of country.

*If the lines in question were being operated by the defendant corporation as component parts of its railroad, line or system during the years for which the tax was assessed, the question must be answered in the negative.*

That the defendant corporation was legally operating the lines in question is not disputed, and abundantly appears from the agreed statement. When the taxes in dispute were assessed, the lines in Concord and vicinity were operated by the defendant under a lease of the Concord & Montreal Railroad dated June 29, 1895; the lines in Portsmouth and vicinity were in part constructed as extensions of the Portsmouth & Dover Railroad, at the time of such extensions leased to the defendant, and were completed by the defendant after the Portsmouth & Dover Railroad was merged with the defendant on January 1, 1900, and have been since owned and operated by the defendant.

That the excluded lines were component parts of the defendant's railroad, line and system clearly appears from the printed case and the documents which are made part of the case.

1. The Concord Street Railway was incorporated by the Legislature of New Hampshire by Act of 1878, Chapter 118, as the Concord Horse Railroad; by Act approved March 25, 1891, its name was changed, and on November 30, 1903, it was merged with the Concord & Montreal Railroad under the authority of New Hampshire Laws of 1903, Chapter 195, approved January 29, 1903.

This act authorizing the acquisition of the Concord Street Railway provided: "If the Concord Street Railway shall be acquired by the Concord & Montreal Railroad, under the provisions of this act, said Concord Street Railway property shall be operated and managed as a part of the Concord & Manchester branch of the Concord & Montreal Railroad."

The act further provided (Section 4) "that any railroad property, including the Concord Street Railway, or any property used in whole or in part for the production of electrical energy under the provisions of this act, shall be treated as permanent additions or permanent improvements to the Concord & Montreal Railroad under the provisions of its lease to the Boston & Maine Railroad, dated June 29, 1895."

In 1901, by petition to the Supreme Court of the State of New Hampshire, the Concord & Montreal Railroad asked for authority to "build an extension and branch or branches to its steam railroad, to be operated by electricity as the motive power," and upon a report of the Board of Railroad Commissioners of New Hampshire dated March 13, 1901, was granted authority under the Public Laws of

New Hampshire, Chapter 156, to extend its electric road from the intersection of Maine and Pleasant Streets in Concord, through Suncook Village and Hooksett Village, to and into the City of Manchester; this additional mileage was built in 1902, partly along the existing right of way of the Suncook Branch of the Concord & Montreal Railroad.

The agreed case further states:

"The Concord and Montreal Railroad at all times herein mentioned is and was leased to and operated by the Boston and Maine Railroad and in 1919 was merged with the Boston and Maine Railroad. The lessee, the Boston and Maine Railroad, in said lease agreed to pay all operating expenses, repairs, contract obligations, insurance, taxes upon said Concord and Montreal Railroad and roads owned and leased by the said Concord and Montreal Railroad, said lease being dated June 29, 1895, and being for a period of ninety-one (91) years and providing for the operation and maintenance of the property mileage of the said Concord and Montreal Railroad and all its owned and leased lines by the said Boston and Maine Railroad, and operated and maintained by the Boston and Maine Railroad, and the said electric mileage at all times herein mentioned was owned by the Concord and Montreal Railroad and is and was operated and maintained by the Boston and Maine Railroad under its lease until consolidation and thereafter as owner; and it is further agreed that there is not now and never has been any separate independent organization of said electric mileage other then as above stated, although for accounting purposes the revenues and disbursements received from and expended upon said mileage are kept separate upon the books of the Boston and Maine Railroad."

It thus appears beyond question, aided by an examination of the map which is part of the case, that when the taxes in question were assessed the defendant corporation was operating as a part of its railroad system, under lease from the Concord & Montreal Railroad, a line of railroad extending from the Village of Penacook, through the city of Concord, and, by the way of Bow Junction in the town of Bow, through the town of Pembroke, the village of Suncook, and the town of Hooksett, to and into the city of Manchester, a main line mileage of 28.71 miles. This mileage, by express requirement of the Laws of New Hampshire (1903 Chap. 195, Sec. 3), was "operated and managed as a part of the Concord & Manchester branch of the Concord & Montreal Railroad."

2. As to the mileage in Portsmouth and vicinity. In 1898, upon petition to the Supreme Court of New Hampshire, representing that the public good required "that it build an extension and branches and additions to its steam railroad, to be operated by electricity as the motive power," the Portsmouth & Dover Railroad was authorized to build a line, "beginning on Noble's Island in said Portsmouth, at the end of the track of said Portsmouth & Dover Railroad where it connects with the track of the Eastern Railroad in New Hampshire," thence running through certain named streets in the city of Portsmouth, and through a part of the town of Rye to a point near the Congregational meeting-house in Rye. Upon later petitions of the Portsmouth & Dover Railroad extensions of this electric road in Portsmouth and Rye were authorized. At the time all these proceedings were taken the Portsmouth & Dover Railroad was under lease to the defendant corporation, and on January 1, 1900, was merged therewith under authority from the States of Maine, New Hampshire and Massachusetts. Later upon similar petition by the Boston & Maine Railroad this electrically-operated railroad was further extended (See *B. & M. Railroad* v. *Mayor & Aldermen of Portsmouth*, 71 N. H., 21) until at the time of the assessments in question the defendant was operating by electricity a railroad beginning as above stated, at the end of the Portsmouth & Dover track where it connects with the track of the Eastern Railroad, now the Boston & Maine Railroad, and thence running through the streets of the city of Portsmouth, and along the shore through the towns of Rye, North Hampton and Hampton, to the Boston & Maine station in North Hampton, and to a connection in the town of Hampton with an electric railroad to Newburyport; the total mileage of main line track is 15.48 miles.

The agreed statement further says:

"As in the case of the other electric mileage, so in this case there is no independent company, corporation or association owning, operating or maintaining said mileage, although in all cases the receipts and disbursements are kept separate upon the books of the Boston & Maine Railroad."

As to all the lines, of which the mileage and transportation receipts were excluded, the case states:

"In all cases the ownership is by virtue of legislative authority and in all cases the owning, operating and maintaining railroads are

and were at the time of the assessment of the taxes in issue, owned, operated and controlled by the Boston & Maine Railroad, and in all cases their profit and loss account constitutes an integral factor in the valuation of the Boston and Maine Railroad stock. In all cases their construction, equipment, maintenance and operation were financed by the sale of stocks and bonds of the steam railroads which at the time of the assessment of the taxes in issue were owned, operated and controlled by the Boston and Maine Railroad.

"All of the electric mileage herein referred to is, and was during each and all of the years mentioned, of the ordinary type of electric railway construction, operated by electricity from overhead trolley wires, and used solely for transportation of persons and property by electrically operated cars."

\*     \*     \*     \*     \*     \*     \*     \*

"Some portions of said electric lines are on private rights of way, but the larger part of said electric lines follows and is located within the limits of the streets and highways of the cities and towns through which said electric lines operate."

This extended examination of the statutes and records as to the acquisition, construction and operation of the excluded lines has seemed necessary that it may clearly appear that those lines are not railroads operating only in city streets, but are inter-urban lines operated by electricity; that the Concord lines are, by express enactment of the New Hampshire Legislature "operated and managed as a part of the Concord & Manchester branch of the Concord & Montreal Railroad," leased to the defendant; that the Portsmouth lines were constructed, under provisions of New Hamsphire laws, as extensions of the Portsmouth & Dover Railroad and, with said Portsmouth & Dover Railroad, were, when said taxes were levied, parts of and merged with and owned by said defendant corporation; and that all these electrically-operated lines were, when the taxes were assessed, operated as parts of the Boston & Maine Railroad System, although, as the case states, there is no interchange of motive power or rolling stock between the steam operated and electrically-operated lines.

The facts clearly bring the Boston & Maine Railroad System within the provisions of Secs. 26 and 27 of Chap. 9 of the R. S.; that

is conceded.    But the State claims that the tax is to be based not upon the gross transportation receipts of such system "over its whole extent," but upon a part only, excluding the receipts from electrically-operated lines; and that such part of the gross receipts is to be divided not "by the total number of miles operated" but by the mileage as ascertained by deducting the mileage of the electrically-operated lines.

I can find no authority of law in support of this proposition; on the contrary the case shows that the lines in question are component parts of the Boston & Maine Railroad.

I think that judgment should be entered for defendant.