C. H. BRESSLER AND C. H. BRESSLER, AS LEGISLATIVE REPRESENTATIVE OF THE NEBRASKA LEGISLATIVE BOARD, BROTHERHOOD OF RAILWAY TRAINMEN, APPELLEE, V. CHICAGO AND NORTH WESTERN RAILWAY COMPANY, A CORPORATION, APPELLANT.

42 N. W. 2d 617

Filed May 12, 1950.    No. 32773.

Neely & Otis, for appellant.

Van Pelt, Marti & O'Gara, for appellee.

Heard before SIMMONS, C. J., CARTER, MESSMORE, CHAPPELL, WENKE, and BOSLAUGH, JJ.

WENKE, J.

C. H. Bressler as an individual and as legislative representative of the Nebraska Legislative Board, Brotherhood of Railway Trainmen, filed a complaint with the Nebraska State Railway Commission against the Chicago and North Western Railway Company, a corporation. He complains that since November 6, 1947, the carrier has been operating its passenger trains No. 21 and No. 22, which run between Omaha, Nebraska, and Winner, South Dakota, through Norfolk, Nebraska, in Nebraska contrary to the provisions of the Nebraska full crew law, section 74-532, R. S. 1943, and in an unsafe manner. He asked the commission to find that the carrier's method of operating these passenger trains is unsafe and that it require the carrier to operate these trains in compliance with the statute.

After a hearing the commission held: That the full crew law did not apply to motor cars or trains and dismissed the complaint insofar as it had application to trains No. 21 and No. 22 when operated as motor trains; that carrier has not complied with the statute by providing a baggageman-brakeman in the manner that it did and directed it to have a brakeman or flagman on these trains, when they are operated as a steam train, who is not a baggageman; and that no showing had been made which either required or justified it to take any independent action affecting the minimum personnel to be included on these trains and the application for it to do so was denied.

Both complainant and carrier filed motions for rehearing. From the overruling thereof carrier appealed and Bressler cross-appealed.

For convenience the parties will be referred to herein as complainant and carrier.

It should be stated there is nothing in the record to

prove or even indicate that carrier's method of operating these trains, in view of all the facts and circumstances relating thereto, is in any manner unsafe. This relates particularly to its manner of operating them on and after June 16, 1941, when they are operated as motor trains, and on and after November 7, 1947, when they are operated as steam trains. When operated as motor trains the crews, since June 16, 1941, have consisted of an engineer, a conductor, and a baggageman-brakeman. The latter is always qualified to perform the duties of a brakeman or flagman. When operated as steam trains the crews, since November 6, 1947, have consisted of an engineer, a fireman, a conductor, and a baggageman-brakeman. The latter is always qualified to perform the duties of a brakeman or flagman.

The primary question presented by carrier is, does a numerically full crew comply with the provisions of section 74-532, R. S. 1943, when one of the crew, the brakeman, has baggage work assigned to him?

The Full Crew Act was first enacted by the 1909 session of the Legislature and appears as Chapter 98 on page 405 of the 1909 Session Laws. The title thereof is as follows: "AN ACT to protect the lives and property of the traveling public and the employees of the railroads of the State of Nebraska, of and concerning railroads in said state, and defining the crews which shall man passenger and freight trains and providing penalties for the violation thereof and repealing laws in conflict herewith."

From the language used in the title it is evident that one purpose of the statute is to provide for safety in the operation of passenger trains. Safety not only for the passengers riding thereon but also for the employees traveling therewith.

This statute, insofar as it relates to passenger trains, now provides: "It shall be unlawful for any railroad company doing business in the State of Nebraska to operate or run over its road, or any part thereof, or suffer

or permit to be run over its road, or any part thereof, outside of the yard limits, any passenger, mail or express train carrying passengers, whose regular equipment consists of more than five cars, with a crew, consisting of less than one engineer, one fireman, one conductor, one brakeman and one flagman. Passenger trains whose regular equipment consists of five cars or less, may be operated with a crew consisting of one engineer, one fireman, one conductor and one brakeman or flagman." § 74-532, R. S. 1943.

To carry out this purpose the act provides that passenger trains, depending on their size, must always be manned and operated by a certain number of employees classified according to the duties they perform. By so doing the Legislature recognized that in order to secure the maximum of safety in the operation thereof certain duties must always be performed by someone qualified to perform them. The act does not actually specify what these duties are but, in the absence thereof, it can only mean such duties as are generally associated with such positions by custom and practice. Compliance with this statute does not mean that such employees cannot perform other duties than those of the position to which assigned. If they are qualified to perform the duties of the position to which they are assigned and, during the trip, are at all times available to perform them when need therefor arises and actually do perform them, then the statutory requirements have been met even though they may be assigned to and perform other duties.

The consist of trains No. 21 and No. 22 is as follows: When operated as a motor train it has a combination motor and express car, a combination baggage and railway mail car, and a coach; when operated as a steam train it has a locomotive, an express car, a combination baggage and mail car, and a coach. It will be observed that it operates at all times as a train with less than five cars.

Prior to November 7, 1947, when passenger trains No.

21 and No. 22 were operated as steam passenger trains and carried a crew of an engineer, a fireman, a conductor, a brakeman, and a baggageman, the evidence shows the brakeman usually performed the following services: Upon reporting placed the identification marker or lights on the rear of the train; checked the fire, when needed, in the heating system of the coach and also checked to see if the coach was properly ventilated; set the air on the brakes and walked the length of the train to the engine to see they were in good working condition; after arriving at the engine had the engineer release the brakes and then walked back and checked to see if they were all properly released; helped load passengers, assisting with their baggage; received the train order from the conductor and read it; checked the mail, baggage, and express cars to see if they were loaded; returned to the coach and closed the trap doors just before leaving and remained on the rear of train to see that no one got off or on while it was departing; between stations stayed in the rear of the coach to get off to flag in case train was stopped at any place but the stations; before the train stopped at any station he informed passengers getting off there that their station was next; when the train stopped helped them off and assisted passengers getting on; helped unload and load the mail, baggage, and express; and watched for signals from other trains and at stations.

After November 6, 1947, when trains No. 21 and No. 22 were operated as steam passenger trains and the crew consisted of an engineer, fireman, conductor, and a baggageman-brakeman, the evidence shows: That the baggageman-brakeman was qualified to perform the duties of a brakeman or flagman and carried full flagging equipment with him in the baggage compartment; that he was subject to call by the conductor to perform flagging but did so of his own accord only when the train stopped between stations; that he at all times worked in the baggage compartment of the combination baggage-rail-

way mail car; that this car was divided by a partition so no practical way was available for him to get to the rear of the train except to get out of the car he was in and walk back, a distance of about 120 feet; and that this would be impossible if the train stopped on a bridge.

The baggageman-brakeman's work as a baggageman, which occupied his full time and which kept him busy in the baggage compartment, consisted of handling cream cans, both empty and full, sacks of mail, large parcel post packages, baggage, and bundles of newspapers. At the stations he loaded and unloaded these items and, when necessary, helped the expressman with heavy express shipments. If the stations were closed, as most of them were on Sundays, he put what he unloaded either in the freight house, depot, or mail box. Usually he was the last one through and often the train had to wait for him to finish before it could depart. Enroute he made out his reports. These covered the various items handled and required separate reports for cream cans, mail, and baggage. He also handled company mail, sorting it enroute, and delivering it at the various stations. If cream was shipped without billing he made out and attached way bills thereto.

It should here be stated that flagging is not performed or necessary at station stops, unless the train is delayed for some reason, but is immediately necessary should the train at any time be stopped enroute.

Complainant introduced numerous operating rules of the carrier showing that the duties brakemen performed prior to November 7, 1947, were therein classified as duties which they must perform. It is true that these operating rules so provide. But these operating rules of the carrier are no part of the statute and not controlling thereof. There is nothing in the statute which prevents the carrier from changing them and assigning other duties to brakemen as long as the change does not take from them the duties of the position which the statute contemplates they shall perform and leaves them at all

times available to perform them when the need therefor arises.

The evidence fully establishes that the baggageman-brakeman is a baggageman in fact and in no sense a brakeman, although he is qualified as such. It probably is, as one of carrier's officials stated, a good economical operational change. However, what was said in New York, C. & St. L. R. R. Co. v. Public Utilities Commission, 123 Ohio St. 524, 176 N. E. 71, under a like statute and an almost identical situation, is particularly applicable here. Therein the court said:

"The railroad company is only complying with the statute upon the theory that the baggageman, employed as such, is discharging a sufficient number of the detailed duties of a brakeman to constitute a compliance with the statute. The train does not carry more than two cars, and that portion of the statute forbidding a brakeman to perform the duties of baggageman or express agent does not apply. There is therefore nothing to forbid a brakeman from performing some of the duties of baggageman or express agent. On the other hand, the statute does not provide that a train consisting of only two cars may be served without a brakeman, neither does it provide that a baggageman or express agent may take the place of a brakeman and perform only a part of the duties of a brakeman. The statute very clearly requires a brakeman as a part of the crew of every train carrying passengers. Manifestly it can make no difference by what name the servant is called, provided some particular servant in the employ of the railroad company performs all the duties usually assigned to a brakeman. * * * It is evidently the purpose of the statute to make the transportation of passengers safe. Whether or not that transportation is rendered more safe by literal compliance with the statute we need not inquire. The question before us is not the political question of the wisdom of the statute, but the justiciable question of its proper interpretation.

"The Public Utilities Commission has declared a rule of strict compliance, while the railroad company contends that the service need be such only as is reasonably necessary for the safety of passengers and employees on trains. * * * The Legislature has the undoubted power to regulate. The meaning of the language employed in the statute is clear. Its apparent purpose and intent is that the duties of the conductor and the brakeman be entirely separate and distinct, and that each shall discharge the duties of his separate position. If, as is apparently contended by the railroad company, the regulations are unnecessarily strict for the operation of a train of two cars, the remedy lies with the Legislature, which deals with the policy, and not with the court, which deals only with a determination of the legislative intent. It is conceded by the Attorney General that a regularly constituted brakeman on a two-car train, who discharges all the duties pertaining to the position of brakeman, and who has time, in addition to the performance of that service, to also perform the duties of baggageman or expressman, is not forbidden to do so. With this interpretation we concur. This view, however, does not in the least obviate the plain requirement of having one person, whether he carry title of brakeman, or other designation, perform all the duties which customarily devolve upon a brakeman, and having another person perform all the duties which customarily devolve upon a conductor."

And as stated in Public Service Commission v. Baltimore & Ohio R. R. Co., 260 Pa. 323, 103 A. 724: "The statute required that the train should have, as one of its operating crew, a brakeman on it all the time it was being operated, his duty being to assist in the safe operation of it, and not to supervise and manage a dining room on it. The statute is clear and controlling, and there is not to be substituted for its requirement the judgment of the conductor of a train, or of any one else, as to when, in its operation, there ought to be a brakeman on it; and

yet this, in effect, is the contention of the appellee, for admittedly the dining car conductor was to be a brakeman only when called upon by the train conductor to act as such. It may be again noted that the dining car conductor never at any time acted in that capacity, and the train all the time he was on it was, therefore, without a brakeman. How, then, can it be said that the appellee has complied with the Act of 1911? The wisdom of its clear provision as to the size of a crew is not for the courts. Their duty is confined to enforcing it as a piece of legislation not prohibited by the Constitution * * * ."

To like effect is the logic and reasoning of the cited case of Beal v. Missouri Pacific R. R. Corp., 108 F. 2d 897, which was, for other reasons, reversed by the United States Supreme Court. See 312 U. S. 45, 61 S. Ct. 418, 85 L. Ed. 577.

From the evidence adduced we have come to the conclusion that since November 6, 1947, the carrier has not complied with that part of section 74-532, R. S. 1943, which requires it to have a brakeman or flagman on all its passenger trains of five cars or less while operating its trains No. 21 and No. 22 as steam passenger trains.

It should be understood that this opinion should in no manner be considered to have determined or decided any questions affecting the relations or rights between this carrier and its employees arising out of any agreement they may have entered into under the provisions of the National Railway Labor Act.

By his cross-appeal complainant questions the correctness of our holding in Moredick v. Chicago & North Western Ry. Co., 125 Neb. 864, 252 N. W. 459, that the act was not intended to apply and did not apply to motor trains. He asks us to hold that it does. For the reasons therein stated we think our holding in that opinion is correct. For a very full and complete discussion of this same question, wherein the same conclusion is reached, see Railroad Commission of Texas

v. Texas & New Orleans R. R. Co., (Tex. Civ. App.) 42 S. W. 2d 1091. As therein stated: "* * * the statute under construction is not only remedial in its nature, but penal as well, and must be construed with at least a reasonable degree of strictness with respect to including anything beyond the immediate scope and object of the statute, even though within the spirit, and nothing can be added to the act by inference or intendment. * * * If the Legislature had in mind a gasoline motor car or train, it could have easily said so, and we believe it would have done so by appropriate language, and in absence of which we will not extend the scope of the act to include motor cars of the character involved in this suit."

There is also a further reason why it can be said our opinion correctly interpreted the legislative intent by holding it did not apply to motor trains. The opinion was released on January 26, 1934. If it did not correctly interpret the legislative intent there have been numerous sessions of the Legislature when it could have been specifically so provided. The fact that it has not done so can but lead to the conclusion that our construction thereof correctly reflects what it intended.

We have come to the conclusion that the holding of the Nebraska State Railway Commission is correct. It should be and is affirmed.

AFFIRMED.