The WESTERN PACIFIC RAILROAD COMPANY, a
CORPORATION, APPELLANT, *v.* THE STATE OF
NEVADA, RESPONDENT.

No. 3668

March 6, 1952.                    241 P.2d 846.

*Woodburn, Forman & Woodburn & Gordon Thompson,*
of Reno, for Appellant.

*W. T. Mathews,* Attorney General, *George P. Annand,
Robert L. McDonald, Thomas A. Foley,* Deputy Attorneys General, of Carson City, and *Jack Streeter,* District
Attorney, Washoe County, and *John C. Bartlett,* Deputy
District Attorney, Washoe County, for Respondent.

## OPINION

By the Court, MERRILL, J.:

The Western Pacific Railroad Company has appealed from judgment of the trial court that the state recover the statutory penalty of $500 for violation of the Nevada "full crew law" and from order of that court denying motion for new trial. The applicable statute provides (sec. 6318, N.C.L.1929):

"It shall be unlawful for any person, firm, company or corporation engaged in the business of common carrier, operating freight and passenger trains, or either of them, within or through the State of Nevada, to run or operate, or permit or cause to be run or operated, within or through this state, along or over its road or tracks, other than along or over the road or tracks within yard limits, any freight or passenger train consisting of two cars or less, exclusive of caboose and engine and tenders, with less than a full crew consisting of not less than four persons, to wit, one engineer, one fireman, one conductor and one brakeman, who will act in the capacity of flagman."

On January 18, 1950, the company operated over its tracks from Elko, Nevada, to Portola, California, a Budd railroad Diesel car manned by a crew of three: a conductor, an engineer and a brakeman-flagman. The car is an 85-foot self-propelled, Diesel-powered, single-car passenger unit, having a baggage compartment and accommodations for 90 passengers. This action was brought by the state for failure of the company to provide a fireman pursuant to the provisions of the quoted section. The company contends that the full crew law and, specifically, the word "train" as there used may not properly be construed to apply to operation of the Budd car. Such is our view.

The question is one of statutory construction. The full crew law was passed March 12, 1913. It must be accorded a meaning compatible with the conditions and

circumstances then existing and "the plain, evident policy and purview of the act." Ex Parte Iratacable, 55 Nev. 263, 282; 30 P.2d 284, 290. "We must ascertain the evils sought to be remedied." Escalle v. Mark, 43 Nev. 172, 175; 183 P. 387, 388; 5 A.L.R. 1512. "The meaning of words used in a statute may be sought by examining the context and by considering the reason or spirit of the law or the causes which induced the legislature to enact it. The entire subject matter and the policy of the law may also be invoked to aid in its interpretation, and it should always be construed so as to avoid absurd results." Ex Parte Siebenhauer, 14 Nev. 365, 368. "The leading rule for the construction of statutes is to ascertain the intention of the legislature in enacting the statute, and the intent, when ascertained will prevail over the literal sense." State ex rel. O'Meara v. Ross, 20 Nev. 61, 63, 14 P. 827, 828; State ex rel. Hinckley v. District Court, 53 Nev. 343, 352, 1 P.2d 105, 106. "It is a cardinal rule of construction that the purpose of a law is to be kept in view and the statute given a fair and reasonable construction with a view to effecting its purpose." Ex Parte Douglass, 53 Nev. 188, 191, 295 P. 447, 448.

With reference to the full crew law of Nebraska, the supreme court of that state has said (Bressler v. Chicago & N. W. Ry. Co., 152 Neb. 732, 42 N.W.2d 617, 619):

"* * * the act provides that passenger trains, depending on their size, must always be manned and operated by a certain number of employees classified according to the duties they perform. By so doing the Legislature recognized that in order to secure the maximum of safety in the operation thereof certain duties must always be performed by someone qualified to perform them. The act does not actually specify what these duties are but, in the absence thereof, it can only mean such duties as are generally associated with such positions by custom and practice."

So here, our legislature in 1913 may be said to have

recognized that in the proper operation of a railroad certain duties must in the interest of public safety be regularly performed; that they must be performed by qualified persons; that a sufficient crew must be provided so that one member need not assume the duties ordinarily assigned to another where such assumption would interfere with the regular performance of his own essential duties. By the language which is used the legislature indicated that it was the performance of essential duties with which it was concerned.

The company contends that in the operation of the Budd car no duties remain to be performed by a fireman. This, we feel, is the sole issue to be determined. To impute to the legislature an intent to require employment of a fireman in the absence of such duties would in effect be to impute an intent that these duties continue to be performed notwithstanding conditions rendering them wholly unnecessary. In the light of the language used and since the express purpose of the act is public safety, this would indeed be an absurd result. In addition, such construction would appear to be so clearly unreasonable as to render the act invalid in exceeding the police power of the state.

Testimony in the record before us has dealt with the duties of the railroad fireman in some detail. The duties divide themselves into two classes: fueling and lookout.

As to the first: The steam, source of the propulsion power of the steam locomotive, is generated in a horizontal boiler from water brought to the boiling point by the application of heat from a fire maintained in a firebox located at the rear of the boiler and opening into the cab of the locomotive. Historically, wood was the first fuel used to feed the fire, later supplanted by coal and, still later in some locomotives, by oil. To furnish a supply of the fuel, a vehicle known as a tender is towed behind the locomotive. The duties of the fireman in wood or coal-fired locomotives are to feed the fuel to the fire, and to make sure that there is a proper level of water in the

boiler. Around the turn of the century mechanical progress had developed an automatic stoker to bring the fuel to the firebox from the tender, eliminating the necessity for manual stoking by the fireman. With the development of the oil-fired locomotive the fireman's primary duty is operation of a valve controlling the flow of the fuel into the box. With both the automatic stoker and the oil-fired locomotive it is necessary for the fireman to check the fire for even burning and his duties relative to the water level and steam pressure continue.

As to the second: The location of the steam boiler to the front of the cab creates an obstruction to the vision of anyone occupying the cab. The engineer's station is on the right of the cab and without deserting his controls it is impossible for him to observe the left side of the track or of the train. The fireman thus is given the responsibility of being "the eyes and ears of the engineer on the left side of the train." When not occupied with fueling duties, his lookout duties are constant.

These, then, were the essential duties of the fireman in railroad operation as it was known to the legislature in 1913. They were duties which could not with any degree of safety be performed by any other member of the four-man crew specified by the act.

In operation of the Budd railroad Diesel car no fueling duties are required of any crew member. There is no fire to maintain for steam pressure. There is no water level to watch. The engines, similar to those used on many busses, are located underneath the car and are inaccessible from the cab. The fueling, as in gasoline engines, is automatic. Likewise the essential lookout duties as known to typical steam operation do not exist in the Budd car. There is no boiler to obstruct the engineer's view. The cab is located at the very front of the car. Through four windows to the front and side of the cab and two rearview mirrors, the engineer from his seat has an unobstructed view to the front, side and rear, superior to the combined views of both engine crewmembers when stationed behind a steam boiler. It is

clear that the essential duties of the fireman as known to the 1913 legislature no longer remain to be performed in the Budd car.

The state insists, however, that certain traditional duties remain to be performed by the fireman. These are specified as follows:

(1) In the operation of a train an engineer acts under written orders. It is required by railroad regulation that he show these orders to the fireman. The fireman must understand them and remind the engineer if he overlooks them in any respect.

(2) In operation of a train the engineer is governed by many signals along the line. It is the fireman's duty to observe and understand all signals and call them to the engineer's attention.

It is clear, however, that these are essentially duties of the engineer. The fireman is simply reinforcing the engineer in his performance of those duties; in effect sharing the responsibility of the engineer. In cases where the presence of a fireman in the cab is necessary to the performance of a fireman's function, it is understandable that such reinforcement of the engineer might be regarded as desirable. Where his presence is not otherwise necessary, however, the employment of a fireman can only be justified upon the assumption that the engineer will not properly perform the duties assigned to him. Further, such sharing of responsibility would appear as a safety measure to partake of a somewhat dubious quality. As a matter of common knowledge we know that operators of high speed, interurban, electric trains not only operate upon their own sole responsibility (under more hazardous traffic conditions than this railroad through this state is required to meet), but are firmly and positively isolated against the distractions created by the presence of others.

Furthermore, even assuming such duties to be desirable in the interest of public safety, it does not appear from the record that a separate crew member is at all

necessary to their performance. From undisputed testimony frequently reiterated throughout the record it would appear clear that all such duties could on the Budd car be assumed by the conductor or brakeman or shared between them.

We cannot, therefore, impute to the legislature the intent to require the presence of a fireman or fourth crew member upon this type of car for the sole purpose of reinforcing the engineer in the proper performance of his duties and of sharing his responsibility in that regard.

The state further emphasizes the possibility of sudden death or disability of the engineer and its obvious effect upon public safety (the very basis of the full crew law) should the engineer be alone in his cab. The Budd car has provided a safety device known as the "dead man's pedal." The engineer is required to maintain constant foot pressure upon this pedal. Should he remove his foot or move it slightly upon the pedal the car automatically is brought to a stop. The state, through cross-examination of witnesses, has established a degree of uncertainty in the unfailing success of this device's operation. Should the engineer, following death or loss of consciousness, remain in his chair in such a position that pressure upon the pedal continues without slightest interruption, the safety effect of the device would be lost. The degree of probability of such an occurrence, however, is not discussed in the testimony.

The department of public utilities of the Commonwealth of Massachusetts in an opinion relating to this same Budd car (Brotherhood of Railway Trainmen v. Boston-Albany Railroad, 92 P.U.R.N. 298, October 5, 1951) has aptly stated: "There is no panacea which will guard without fail against any possible human failure." Later in the opinion it is said:

"In matters of public safety, as in most other social relationships, there is such a thing as a law of diminishing returns. While we do not intend to permit any carrier or other utility under our jurisdiction to fail or

refuse to take every reasonable precaution to protect the public, there is a line which separates reasonable precautions from unreasonable requirements. We are of the opinion that to compel respondent to put another man on this essentially simple operation would be unreasonable. We feel that one more man would accomplish nothing which cannot be handled by the present crew in the absence of absurd hypotheses, such as the simultaneous death or disability of both the engineer and the conductor."

In the case before us, as we have already indicated, no reason appears why the conductor and brakeman between them could not provide any necessary watch over the continued fitness of the engineer.

In the Massachusetts proceeding, it might be mentioned, no contention was made that a fireman was necessary to safe operation of the car. The question was whether employment of a brakeman in addition to the conductor and engineer was essential. The holding was that under the particular circumstances there outlined (including automatic centralized signal protection supplemented by automatic stopping devices) a crew of two was sufficient.

In our view, therefore, we may not impute to the legislature an intent to require employment of a fireman or fourth crew member for the sole purpose of protecting against the possibility of sudden death or disability of the engineer under circumstances rendering appropriate safety devices ineffective.

Two cases only have been cited to us upon the precise point here involved: employment of a fireman upon this type of car under this type of statute: Railroad Commission v. Texas & New Orleans R. Co., Tex.Civ.App., 42 S.W.2d 1091; Moredick v. Chicago & Northwestern Railway Co., 125 Neb. 864, 252 N.W. 459. Both cases squarely support our view in construction of our statute. In the Texas case it is stated:

"Manifestly the effect of the general language, 'any passenger train with less than a full crew consisting of

four persons,' is limited by the language immediately following it, specifically naming and defining the kind and character of the four persons to be employed, to wit, one engineer, one fireman, one conductor, and one brakeman. The facts and common knowledge show that these four particularly named persons had specific duties to perform on steam-propelled passenger trains when the act was passed, thus indicating the kind or character of passenger train on which the Legislature intended a full crew of these four particular persons should be maintained. Clearly it is not, as contended by appellants, manifest from the language of the statute, standing alone, that the Legislature by unmistakable implication intended to extend the law beyond the immediate scope and object of the statute as of the time of its enactment, so as to require steam railroad companies to now maintain, without regard to name or the difference in duties imposed, a full crew of four persons on their modern gasoline or electric motor cars carrying passengers over such steam railroads. [42 S.W.2d 1094.]"

Accordingly we conclude that the legislature may not be held to have intended the provisions of the full crew law to apply to operation of the Budd railroad Diesel car. That law and specifically the word "train" as there used may not, therefore, be construed to apply to such operation.

The judgment of the trial court is reversed and the case remanded with instructions that judgment be entered for the defendant.

BADT, C. J., and EATHER, J., concur.